UNITED STATES, Appellee,

v.

Aedan C. McCARTHY, Defendant,
Appellant.

UNITED STATES, Appellee,

v.

Jeffrey Scott HUNTER, Defendant,
Appellant.

Nos. 95–1105, 95–1106.

United States Court of Appeals,
First Circuit.

Heard Sept. 11, 1995.

Decided Feb. 26, 1996.

Brian L. Champion with whom Friedman & Babcock, Bath, ME, was on brief, for appellant Aedan C. McCarthy.

Henry W. Griffin, Portland, ME, for appellant Jeffrey Scott Hunter.

Margaret D. McGaughey, Assistant United States Attorney, with whom Jay P. McCloskey, United States Attorney, and Jonathan R. Chapman, Assistant United States Attorney, were on brief, for appellee.

Before STAHL, Circuit Judge, CAMPBELL, Senior Circuit Judge, and LYNCH, Circuit Judge.

STAHL, Circuit Judge.

Following a three-day trial, a jury convicted defendants Aedan McCarthy and Jeffrey Scott Hunter of various charges stemming from a series of bank robberies in Alabama, Connecticut and Maine. On appeal, McCarthy and Hunter challenge the district court's refusal to grant their respective suppression motions. In particular, Hunter challenges the district court's failure to suppress evidence produced as the result of an investigatory stop following the Connecticut robbery. McCarthy and Hunter also raise several challenges to their sentences. After careful review, we affirm.

## I.

### Background

In reviewing a district court's denial of motions to suppress, we recite the facts as found by the district court to the extent that they derive support from the record and are not clearly erroneous. *See, e.g., United States v. Sealey,* 30 F.3d 7, 8 (1st Cir.1994). Where specific findings are lacking, we view the record in the light most favorable to the ruling, making all reasonably supported inferences. *See United States v. Kimball,* 25 F.3d 1, 3 (1st Cir.1994); *United States v. Sanchez,* 943 F.2d 110, 112 (1st Cir.1991).

### A. Hunter's Connecticut Detention

On July 6, 1992, around 1:45 p.m., two men robbed a bank in Franklin, Connecticut. Each man wore a plastic, Halloween-type mask, covering his entire face, and each was armed, one with a pump-action shotgun and the other with a semi-automatic pistol. The man carrying the shotgun stood in the bank's lobby, issuing commands, while the other vaulted the teller's counter and collected the money. They fled the bank in a light-blue GMC Jimmy truck.

A short time later, the Connecticut State Police located the truck, abandoned in an industrial park less than a mile from the bank. Witnesses reported that a red Pontiac Sunbird bearing Rhode Island license plates recently had been parked near the spot where the abandoned GMC Jimmy was found. Subsequently, the police issued an updated radio bulletin, indicating that the two suspects were now believed to be travelling in the red Pontiac Sunbird.

About 2:30 p.m., Officer Arthur Richard of the Norwich Police Department spotted a red Pontiac Sunbird bearing Rhode Island license plates at a gas station, not far from Franklin. Officer Richard reported the sighting, and, after the car left the station, stopped the vehicle as it prepared to enter an interstate highway. Officer Richard ordered the driver out of the Sunbird, patted him down for weapons and directed him to take a seat in the back of his police cruiser. The police cruiser's internal rear door handles were not functional and a plastic spit guard and a wire cage separated its rear and front seats. Officer Richard did not handcuff the driver.

In response to Officer Richard's questioning, the driver identified himself as Hunter. Officer Richard ran a registration check on the Sunbird and learned that it was registered to a rental agency at a Rhode Island airport. Hunter told Richard that a friend had rented the automobile for him because his own car was under repair. Hunter, however, refused to identify the friend.

Within minutes, several other police officers, including Connecticut State Troopers Jerry Hall and Louis Heller, arrived on the scene. Trooper Hall spoke to Hunter through the open rear door of Richard's cruiser and detected alcohol on Hunter's breath. Hunter admitted drinking a few beers with a friend, but declined to identify the friend. At Hall's request, Hunter took a field sobriety test, which he passed.

About 2:43 p.m., Trooper Hall advised Hunter of his *Miranda* rights and informed him that, although he was not under arrest, he was being detained for investigative purposes. Hunter stated that he understood his rights and waived them, but nonetheless declined to say where he had been since 1:00 p.m., stating only that he had been with a "Born–Again–Christian" friend. At some point, Trooper Hall explained that the officers were detaining him because his Pontiac Sunbird matched identically the description of a vehicle involved in a bank robbery that had occurred earlier that day. Trooper Hall continued to question Hunter intermittently for about forty-five minutes. During that time, other officers drove a teller from the bank by the cruiser in an unsuccessful attempt to identify Hunter as one of the robbers. In addition, Trooper Hall took three Polaroid photographs of Hunter.

Meanwhile, Trooper Heller learned that the agency registered as the owner of the Pontiac Sunbird had rented the vehicle to Lance Hall, a black male, who had listed Hunter, who is white, on the rental agree-

ment as a co-driver.[1] After receiving this information, Heller went to a nearby bar and questioned patrons in an attempt to determine whether Hunter and another individual had stopped there earlier. Upon returning to the police cruiser in which Hunter was still being detained, Trooper Heller asked Hunter where he had been prior to the stop. Hunter replied that he had not been anywhere near Franklin, but instead had spent the day at a friend's place in the woods. Hunter, however, claimed not to remember his friend's name nor where the place was located. On the basis of the information he had obtained from the rental car agency, Trooper Heller then asked Hunter if his friend was black. With this question, Hunter became agitated, swore at Heller, and, while gesturing in one general direction, told him to find out for himself. This occurred about 3:45 p.m., approximately seventy-five minutes after Officer Richard initially stopped Hunter.

Trooper Heller knew the area well and could think of only one black male living in the general direction in which Hunter had gestured. Consequently, Trooper Heller drove to that person's house and inquired whether Hunter had visited earlier that day. The black male living at the house identified himself as James Hall and stated that Hunter had been there with another man named John. According to James Hall, Hunter and John had borrowed James Hall's truck earlier in the day and had later returned to Hall's house to change their clothes. After interviewing James Hall, Heller returned to where Hunter was being detained and, at 4:43 p.m., Hunter was released.

### B. The Ensuing Investigation

Following his release, Hunter remained the focus of the Franklin robbery investigation. The investigation involved a coopera-

tive effort between the Connecticut State Police, the Federal Bureau of Investigation ("FBI"), and, ultimately, law enforcement officials in Alabama and Maine. During the course of the investigation, James Hall[2] revealed to investigators that Hunter's friend "John" had recently replaced his Alabama driver's license with a Connecticut license in the name of John E. Perry. Investigators subsequently learned that the real John E. Perry had lost his Alabama license prior to the Franklin bank robbery and that McCarthy had used the alias John Perry in Florida following an arrest there.[3] The real John E. Perry, who lived in Alabama, identified McCarthy as James Hardiman, an individual who had been involved with his former wife. Investigators also learned that, in 1991, Hunter and McCarthy had spent time together as cellmates in a Connecticut state prison.

As the investigation progressed, Connecticut authorities apprised FBI agents in Alabama, who were investigating a series of similar Alabama bank robberies, of the events surrounding the Franklin robbery. Accordingly, McCarthy and Hunter became suspects in the Alabama robberies. In early 1993, Alabama FBI Agent Marshall Ridlehoover learned that McCarthy and Hunter might be living in Chilton County, Alabama. Agent Ridlehoover alerted the Chilton County Sheriff's Department that the two men were suspects in a series of bank robberies in Alabama and Connecticut and sent the department photographs of McCarthy and Hunter. Initially, Ridlehoover told the Chilton County Sheriff's Department that the FBI wanted to have the two men kept under surveillance. Subsequently, Ridlehoover informed the Sheriff's Department that a federal arrest warrant for unlawful flight from prosecution had been issued for Hunter.

### C. Alabama Arrests of Hunter and McCarthy

While driving to work on the morning of April 23, 1993, Deputy Wayne Fulmer, assistant chief deputy of the Chilton County Sher-

---

1. Trooper Heller obtained Lance Hall's driver's license number from the rental agency. He obtained a physical description of Hall after requesting a check on the license with the Connecticut State Police.

2. Investigators also learned that James Hall is the brother of Lance Hall, the person who rented

the Sunbird for Hunter. Neither James nor Lance Hall were involved, in any way, in the Franklin robbery.

3. James Hall initially told investigators that a photograph of the real John Perry resembled the individual he knew as Hunter's friend "John."

iff's Department, noticed a pickup truck bearing Maine license plates. Because the presence of Maine plates in Chilton County struck Fulmer as rather unusual, he ran a registration check on the truck and discovered that the truck was registered to a John E. Perry. Fulmer knew at this time that FBI investigators were looking for an individual using the alias John E. Perry in connection with a series of bank robberies in Connecticut and Alabama.

Later that morning, a woman at the local power company, who had been shown a photograph of Hunter, reported that a person resembling Hunter had requested that power be turned on at his trailer. After receiving this report, Fulmer brought a copy of Hunter's photograph to the woman and asked her to notify the Sheriff's Department if the man returned. A short time later that day, the woman reported that Hunter had returned. Upon learning this, Fulmer left for the power company and requested several back-up units to meet him there. On the way, Fulmer alerted by radio the other officers responding to the scene that an outstanding federal warrant existed for Hunter's arrest. The first officer to arrive at the power company identified himself to Hunter and asked to speak to him. In response, Hunter turned and ran. The officer radioed that the suspect was fleeing on foot and then gave chase.

Several officers eventually caught and arrested Hunter. A search incident to the arrest disclosed an envelope containing $6039 in cash on Hunter's person. Over two weeks later, on May 11, 1993, Agent Ridlehoover matched the serial numbers of twenty bills taken from the envelope to bills stolen from the Casco Northern Bank in Falmouth, Maine, on April 12, 1993.

While Hunter was fleeing on foot, Deputy Fulmer, who had yet to reach the power company, spotted the same pickup truck, which he had seen earlier in the day, heading away from the power company. Fulmer directed an Alabama state trooper who was following him to turn around and stop the truck. At this point, Fulmer did not know the identity of either the person driving the truck or the person who had fled on foot. After stopping the truck, the state trooper asked the driver for identification. The driver of the truck, McCarthy, falsely identified himself as John E. Perry and gave the trooper a Maine driver's license bearing that name.

Subsequently about 12:15 p.m., McCarthy was taken into custody and transported to the Chilton County Courthouse. McCarthy was searched and approximately $2000 in cash was found on his person. Shortly after stopping McCarthy, an official from the Chilton County Sheriff's Department notified Connecticut officials that McCarthy was in custody. The Connecticut officials requested that the Chilton County Sheriff's Department continue to hold McCarthy while they attempted to secure an arrest warrant based on McCarthy's alleged participation in the Franklin robbery. Sometime after midnight, a Connecticut Superior Judge signed an arrest warrant for McCarthy for his participation in the Franklin robbery.[4]

## D. Search and Seizure of McCarthy's Suitcases, Truck and Storage Unit

On the evening of April 23, 1993, the day of McCarthy's arrest in Alabama, Deputy Fulmer received a telephone call from Chilton County resident Gene Ellison. Ellison told Fulmer that McCarthy and Hunter had been staying with his neighbor, Joe Henderson, and that McCarthy and Hunter had left some items in Henderson's trailer that Fulmer should see. Deputy Fulmer agreed to come by Henderson's trailer. When he arrived, Fulmer found a maroon suitcase laying open on Henderson's kitchen table. An AK–47 assault rifle, a pistol, extra clips and a bullet-proof vest sat atop the suitcase in plain view. Henderson told Fulmer that the suitcase and its contents belonged to McCarthy and asked him to take possession of them.

Following McCarthy's arrest, however, James Hall identified McCarthy as Hunter's friend "John."

**4.** Several months later, the Connecticut prosecution against McCarthy was dismissed without prejudice following the discovery that the affidavit on which the Connecticut arrest warrant was based included an incorrect factual statement. Because the disposition of this appeal does not depend on the validity of the Connecticut arrest warrant, we do not discuss it further.

Henderson further explained that he had permitted McCarthy and Hunter to stay with him for the past six days in return for $40 rent. Henderson knew McCarthy and Hunter because the two men had previously rented a trailer from Henderson's landlord, J.B. Ellison. While staying with Henderson, McCarthy and Hunter had slept on a couch and an easy chair in Henderson's living room and had kept their belongings in a back bedroom that Henderson used for storage. On Thursday, April 22, the day before the arrests, Henderson had told the two men that he was expecting company for the upcoming weekend and that they would have to leave. When Henderson left for work on the morning of the arrests, McCarthy and Hunter were preparing to move out of the trailer.

When Henderson returned home that afternoon, Gene Ellison told him that the police had arrested McCarthy and Hunter. Henderson then decided to check his trailer to see if McCarthy and Hunter had left anything behind. In the storage room, he found two suitcases, the maroon suitcase that was closed and locked, and an American Tourister suitcase that was laying open with clothes piled on top of it. Henderson attempted to move the maroon suitcase out of the room to a storage shed behind his trailer but was unable to do so because the suitcase was too heavy. He asked Gene Ellison to help him. Ellison moved the suitcase into the other room and cut the lock off of it in order to find out why it weighed so much. After Ellison cut off the lock, Henderson opened the suitcase and discovered the weapons, the bullet-proof vest and other items. Some time later, Henderson decided he should turn the suitcase and its contents over to the police so he asked Ellison to call the sheriff's department.

During Deputy Fulmer's visit on the evening of April 23, Henderson failed to tell him about the additional American Tourister suitcase Henderson had discovered. Several days later, however, Henderson told an FBI agent about it during an interview. Later, at Henderson's request, Fulmer and FBI agent Rich Schott took possession of the suitcase. Agent Ridlehoover inventoried the American

Tourister on May 1, 1993, pursuant to standard FBI practice. No warrant was obtained for the suitcase.

Following McCarthy's Alabama arrest, a warrant was obtained on April 28, 1993, to search his pickup truck. Accordingly, investigators searched the truck, finding a receipt for a storage unit located in Scarborough, Maine. Subsequently, on May 12, 1993, FBI investigators obtained a warrant to search the storage unit and its contents. The ensuing search revealed a footlocker containing numerous incriminating items with possible connections to the robbery of the Casco Northern Bank. The footlocker belonged to McCarthy, and McCarthy, using the alias John Perry, had rented the storage unit.

### E. Prior Proceedings

Prior to trial, Hunter moved to suppress evidence arising from the Connecticut stop and the Alabama arrests. With respect to the Connecticut stop, Hunter sought to suppress the statements and gesture he made during the first seventy-five minutes of the stop that ultimately led the police to James Hall. McCarthy moved to suppress evidence arising from his Alabama arrest and the searches of the two suitcases, his pickup truck and the Maine storage unit. A magistrate judge held a two-day evidentiary hearing on the motions and, subsequently, issued a recommended decision denying them both. After a de novo review, the district court denied the motions, adopting substantially all of the magistrate judge's recommended findings.

At the ensuing trial, McCarthy and Hunter were tried together before a jury on a five-count indictment alleging various charges arising from a series of three bank robberies in Connecticut, Alabama and Maine.[5] The jury found McCarthy and Hunter guilty of all charges, convicting the two men on Count One of conspiring to commit bank robberies in Connecticut, Alabama and Maine in violation of 18 U.S.C. § 371, on Count Two of committing the Maine robbery of the Casco Northern bank in violation of 18 U.S.C.

---

5. Specifically, Count One of indictment charged McCarthy and Hunter with conspiring to rob the Franklin bank on July 6, 1992, the Peoples Bank

in Woodstock, Alabama, on November 13, 1992, and the Casco Northern bank in Falmouth, Maine, on April 12, 1993.

§§ 2113(a), 2113(d) and 18 U.S.C. § 2, and on Count Three of knowingly using and carrying firearms during the Casco robbery in violation of 18 U.S.C. § 924(c). The jury also convicted McCarthy on Count Four of being an armed career criminal in violation of 18 U.S.C. §§ 922(g)(1), 924(e)(1), and Hunter on Count Five of being a felon-in-possession in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and 18 U.S.C. § 2. Following trial, the district court sentenced McCarthy to 387 months imprisonment.[6] The court sentenced Hunter to 270 months imprisonment to be served consecutively to his Connecticut state sentence for violation of probation.[7]

## II.

### Discussion

On appeal, Hunter challenges the district court's denial of his suppression motion, contending that his Connecticut detention following the Franklin robbery and his later Alabama arrest violated the Fourth Amendment. Similarly, McCarthy challenges the denial of his suppression motion, taking issue with the district court's refusal to find error in his Alabama arrest and the subsequent search of his two suitcases, pickup truck and storage unit. Both defendants also raise several issues relating to their respective sentences. We address each argument in turn.

### A. The Suppression Motions

 Our review of a district court's decision to grant or deny a suppression motion is plenary. *United States v. DeMasi,* 40 F.3d 1306, 1311 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 947, 130 L.Ed.2d 890 (1995). "We defer, however, to a district court's factual findings if, on a reasonable view of the evidence, they are not clearly erroneous." *Id.; see also United States v. Zapata,* 18 F.3d 971, 975 (1st Cir.

1994). A clear error exists only if, after considering all the evidence, we are left with a definite and firm conviction that a mistake has been made. *United States v. McLaughlin,* 957 F.2d 12, 17 (1st Cir.1992). Moreover, we will uphold a district court's decision to deny a suppression motion provided that any reasonable view of the evidence supports the decision. *United States v. Garcia,* 983 F.2d 1160, 1167 (1st Cir.1993).

### 1. Hunter's Connecticut Detention

Hunter initially challenges the legality of the Connecticut stop. Hunter contends that the stop constituted a *de facto* arrest unsupported by probable cause, and, therefore, the comments and gesture he made during the first seventy-five minutes of the stop—leading eventually to the discovery of James Hall—should have been suppressed. Furthermore, Hunter contends that the testimony of James Hall should have been suppressed as the fruit of an illegal arrest. We disagree.

The Fourth Amendment does not demand that probable cause exist prior to all police action. *See generally Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Indeed, it is well-settled that, based merely on a reasonable and articulable suspicion, a police officer may make a brief stop or "seizure" of an individual to investigate suspected past or present criminal activity. *See United States v. Hensley,* 469 U.S. 221, 226–229, 105 S.Ct. 675, 678–81, 83 L.Ed.2d 604 (1985) (extending *Terry* stops to past criminal conduct); *United States v. Quinn,* 815 F.2d 153, 156 (1st Cir.1987). The relevant question in these cases is not whether the police had probable cause to act, but instead whether the actions taken were reasonable under the circumstances. *See United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985).

---

**6.** McCarthy was sentenced to 327 months on Count Two for committing the Casco Northern Bank robbery, to be served concurrently to a 60–month sentence on Count One for conspiracy, and a 180–month sentence on Count Four for being an armed career criminal. On Count Three, the court sentenced McCarthy to the mandatory 60–month consecutive sentence on the § 924(c) firearm violation.

**7.** The court sentenced Hunter to 210 months on Count Two for committing the Maine robbery, to be served concurrently to a 60 month sentence on Count One for conspiracy, and a 120 month sentence on Count Five for being a felon in possession. On Count Three, the district court sentenced Hunter to the mandatory 60–month consecutive sentence on the § 924(c) firearm charge.

In determining whether a challenged action is reasonable, and, thus, falls within the range of permissible investigatory stops or detentions, a court should engage in a two-step inquiry, asking (1) whether the officer's action was justified at its inception; and (2) whether the action taken was reasonably related in scope to the circumstances justifying the interference in the first place. *Terry,* 392 U.S. at 19–20, 88 S.Ct. at 1878–79; *United States v. Stanley,* 915 F.2d 54, 55 (1st Cir.1990). Moreover, the Supreme Court has explained that, in such circumstances, the question of reasonableness requires a court to "balance[ ] the *nature* and *quality* of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *Hensley,* 469 U.S. at 228, 105 S.Ct. at 680 (emphasis added). The inquiry is fact specific and a court should consider the totality of the circumstances confronting the police at the time of the stop. *Kimball,* 25 F.3d at 6; *see also United States v. Rodriguez–Morales,* 929 F.2d 780, 783 (1st Cir.1991), *cert. denied,* 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).

At the outset, we note that Hunter essentially concedes that Officer Richard had sufficient reasonable suspicion to make the initial stop.[8] Hunter's principal complaint, instead, focuses on the second step of the inquiry, arguing that the length of his detention was simply too long. He contends that the length of the Connecticut stop exceeded the permissible durational limits of an investigative stop not supported by probable cause, and, thus, made the entire scope of police conduct unreasonable *per se.*

As we have noted before, however, " 'there is no talismanic time beyond which any stop initially justified on the basis of *Terry* becomes an unreasonable seizure under the [F]ourth [A]mendment.' " *Quinn,*

815 F.2d at 157 (quoting *United States v. Davies,* 768 F.2d 893, 901 (7th Cir.), *cert. denied,* 474 U.S. 1008, 106 S.Ct. 533, 88 L.Ed.2d 464 (1985)); *see also United States v. Place,* 462 U.S. 696, 709–10, 103 S.Ct. 2637, 2645–46, 77 L.Ed.2d 110 (1983) (declining to adopt any outside time limitation on a permissible *Terry* stop, but holding ninety-minute detention of luggage unreasonable on specific facts of case); *United States v. Vega,* 72 F.3d 507, 514–16 (7th Cir.1995) (upholding sixty-two minute stop; "the crux of our inquiry is whether the nature of the restraint meets the Fourth Amendment's standard of objective reasonableness"). "[C]ommon sense and ordinary human experience must govern over rigid criteria." *Quinn,* 815 F.2d at 157 (quoting *Sharpe,* 470 U.S. at 685, 105 S.Ct. at 1575). Indeed, whether a particular investigatory stop is too long turns on a consideration of all relevant factors, including "the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Sharpe,* 470 U.S. at 685, 105 S.Ct. at 1575. Moreover, a court should ask "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* at 686, 105 S.Ct. at 1575.

Furthermore, time of detention cannot be the sole criteria for measuring the intrusiveness of the detention. Clearly, from the perspective of the detainee, other factors, including the force used to detain the individual, the restrictions placed on his or her personal movement, and the information conveyed to the detainee concerning the reasons for the stop and its impact on his or her rights, affect the nature and extent of the intrusion and, thus, should factor into the analysis. *Cf. Zapata,* 18 F.3d at 975 (distinction between investigatory stop and *de facto* arrest turns in part on what "a reasonable

---

8. In his reply brief, Hunter denies conceding that the police had sufficient reasonable suspicion to make the initial stop. To the contrary, we think a fair reading of his opening argument to this court and the arguments he made in his briefs to the district court below belies this contention. In any event, the district court's finding that Officer Richard properly acted in initially detaining Hunter after spotting him shortly after the

robbery, driving a red Pontiac Sunbird, is eminently supportable. The close proximity in both distance and time to the Franklin robbery combined with the fact that Hunter's car identically matched the description of the vehicle the suspects were reported to be driving are articulable and specific facts that clearly gave rise to the reasonable suspicion needed to justify the initial stop.

[person] in the suspect's position would have understood his [or her] situation" to be). Finally, the Supreme Court has admonished that, in all events, "[a] court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575.

■ Though the issue is exceedingly close, we believe that, on the circumstances that obtain here, the district court did not err in refusing to suppress Hunter's statements and gesture leading to the discovery of James Hall. Initially we note that, although Hunter challenges the length of the Connecticut detention in its entirety, the statements and gestures that he seeks to suppress occurred within the first seventy-five minutes of the stop. Thus, we limit the scope of our analysis accordingly and do not address whether the district court would have erred in failing to suppress any statements or evidence obtained later in the stop.

More importantly, when limited to this time frame, we do not find the scope of the stop particularly unreasonable. There is no evidence or even an allegation of less than diligent behavior on the part of the police. The officers on location used a number of different investigative techniques in their efforts to pursue quickly any information that might have dispelled the reasonable suspicion that initially triggered the stop. Officer Richard ran the registration check of the Sunbird immediately after stopping Hunter. Trooper Hall promptly informed Hunter of his rights and questioned him about where he had been since the time of the robbery. Other officers brought a teller from the bank to the scene in an attempt to establish definitively whether or not Hunter had participated in the robbery. Trooper Heller, once on the scene, promptly telephoned the rental agency in an effort to learn more about the individuals who had rented the automobile. In short, we think that the record clearly belies any contention that the police officers involved neglected to employ any reasonably available alternative methods that could have significantly shortened their inquiry. *See Quinn,* 815 F.2d at 158. The excessive length of Hunter's detention arose not because the officers engaged in dilatory tactics, but, instead, because their investigative efforts, though reasonable under the circumstances, failed to dispel the suspicion that gave rise to the stop.[9]

Moreover, while it is clear that Hunter had a constitutional right not to answer any questions, the fact that his responses were evasive and, at times, defiant is relevant in evaluating the scope of the officers' conduct. *See, e.g., id.* (detention of forty-five to sixty minutes; noting that it would have been unreasonable to release defendants when their answers to initial questions raised rather than lowered suspicion); *United States v. Richards,* 500 F.2d 1025, 1029 (9th Cir.1974) (detention over an hour; "implausible and evasive responses ... indicated that something was awry and created even more reason for the investigation being pursued further"), *cert. denied,* 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975). Not only did Hunter's incomplete and vague responses reasonably heighten the officers' suspicion that Hunter had participated in the robbery, they also made the attempt to dispel that suspicion more difficult. Indeed, had Hunter cooperated initially and told Officer Richard that he had been at James Hall's house, the length of the stop would have been much shorter. *Cf. Sharpe,* 470 U.S. at 687–88, 105 S.Ct. at 1576–77 (upholding detention where delay attributable in large part to defendant's evasive attempts to avoid stop).

---

9. In *Michigan v. Summers,* 452 U.S. 692, 700 n. 12, 101 S.Ct. 2587, 2593 n. 12, 69 L.Ed.2d 340 (1981), the Court noted that "[i]f the purpose underlying a *Terry* stop—investigating possible criminal activity—is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry.*" *See also Sharpe,* 470 U.S. at 685–86, 105 S.Ct. at 1574–76. The Court then listed, with apparent approval, a variety of different investigative techniques, including those used here, that police might appropriately use during the course of an investigative stop to dispel their reasonable suspicion. *Summers,* 452 U.S. at 700 n. 12, 101 S.Ct. at 2593 n. 12 (quoting 3 W. LaFave, *Search and Seizure* § 9.2, at 36–37 (1978)).

Next, in attempting to strike the proper balance, we note that the governmental purposes served by the detention in this case are substantial. Indeed, several factors, specific to this case, reasonably enhanced the government's interest in detaining Hunter. First, the nature of the suspected criminal conduct, a daylight armed robbery of a bank involving physical threats to both customers and bank personnel, was severe. Second, the detention took place shortly after the robbery in a nearby town not far from the bank. As a noted commentator has explained, that "the suspected crime is serious enough to prompt flight if the suspect is freed, or ... recent enough that if probable cause soon develops it would be desirable to arrest the suspect and subject him [or her] to a search" are both legitimate reasons for continuing custody that must be considered in the total balance. 3 Wayne R. LaFave, *Search and Seizure* § 9.2(f), at 386 (2d ed. 1987). Finally, the fact that at the time of the stop Hunter was preparing to enter an interstate highway in a rented vehicle bearing out-of-state plates weighs on the government's side of the scale. Objectively, from the perspective of the officers on the scene, if they had not detained Hunter at that point, he could easily have left the jurisdiction and evaded the dragnet of the Connecticut State Police.

Finally, we do not believe, on the facts of this case, that the stop was needlessly intrusive. Although the police detained Hunter in the back of Officer Richard's vehicle, he was never handcuffed, *see, e.g., State v. Reid,* 135 N.H. 376, 605 A.2d 1050, 1053–54 (1992) (placing defendant in cruiser does not make *Terry* stop unreasonable); *cf. Quinn,* 815 F.2d at 157 n. 2 (use of handcuffs does not make *Terry* stop de facto arrest), nor did the officers keep the rear door to the police cruiser continuously closed. Moreover, there is no evidence in the record to suggest that any officer ever drew a gun on Hunter. *Cf. United States v. Trullo,* 809 F.2d 108, 113 (1st Cir.) (use of weapons without more does not elevate stop to de facto arrest), *cert.*

*denied,* 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987).

Furthermore, the officers informed Hunter that, although he was not free to leave, he was not under arrest, and that they were detaining him only for investigative purposes because a car identical to his Pontiac Sunbird had been involved in a bank robbery earlier that day. Additionally, only fifteen minutes after Officer Richard first stopped Hunter, Trooper Hall read Hunter his *Miranda* rights. Clearly, timely disclosure of such information (*e.g.,* the reasons for the detention, and an explanation of the detainee's rights) has the potential to reduce the stress of such a detention and, thus, minimize its intrusiveness. *See Place,* 462 U.S. at 710, 103 S.Ct. at 2646 (noting that incorrect information given to defendant by law enforcement officials during detention militated against finding scope of stop reasonable); *United States v. LaFrance,* 879 F.2d 1, 7 (1st Cir.1989) (similar); *cf. Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975) (fact that *Miranda* warnings given is relevant in determining whether statement given following illegal arrest can be considered voluntary).

In sum, although as we have said the issue is exceptionally close, we think that, on the record before us, the balance tips in favor of the government. Admittedly, Hunter's detention following the Franklin robbery was hardly what one would normally consider "brief," and, under circumstances different from those found here, we have no doubt that an investigative detention of similar length would unacceptably offend the Constitution. Nonetheless, we are not persuaded, on the facts of this case (*i.e.* evidence sought to be suppressed was obtained during the first seventy-five minutes of the stop, diligent efforts by the police to dispel reasonable suspicion, defendant's evasive responses significantly contributing to delay, substantial government interests in the detention, and prompt disclosure to the defendant of his rights and the reasons for the detention), that the district court erred in refusing to suppress Hunter's statements and gesture.[10]

10. Furthermore, we also have substantial doubt concerning the scope of the evidence Hunter seeks to suppress (specifically, the testimony of

James Hall). Though we question, but need not decide, whether the government has sufficiently developed the record below to support such a

## 2. Hunter's Alabama Arrest

■ Hunter also challenges the legality of his arrest in Alabama. Hunter contends that, at the moment of his arrest, the arresting officer did not have probable cause to take Hunter into custody. This challenge is without merit.

The district court found that, at the time Hunter was taken into custody, Deputy Fulmer and the other officers involved in Hunter's arrest were aware of an outstanding federal arrest warrant for Hunter. Such a finding, if supported by the record, is a sufficient basis to support the arrest. See Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971) ("police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause"); cf. Hensley, 469 U.S. at 229–32, 105 S.Ct. at 680–82 (extending Whiteley to cover reliance on a flyer or bulletin to establish reasonable suspicion justifying investigatory stops). Fulmer's testimony at the suppression hearing, stating that, prior to Hunter's arrest, he knew about the warrant and had alerted the other officers involved to this fact, amply supports the finding. The fact that Fulmer's report made subsequent to the arrest fails to mention the warrant is of little moment. Deputy Fulmer explained at the suppression hearing that his report was incomplete, and the district court was fully entitled to credit that testimony.

## 3. McCarthy's Alabama Arrest

McCarthy's challenges to his stop and arrest in Chilton County, Alabama, on April 23, 1993, are equally unavailing. McCarthy contends that no reasonable basis or probable cause existed to stop his pickup truck as it drove away from the power station. Moreover, he contends that, even if the police had sufficient reasonable suspicion to detain him briefly for investigative purposes, the detention became an illegal de facto arrest because he was taken into custody and held without probable cause until 1:00 a.m. the next day when a warrant finally issued.

■ First, we disagree that the district court clearly erred in finding that Deputy Fulmer had sufficient reasonable suspicion to have McCarthy's truck pulled over. Fulmer testified that, at the time of the stop, he was generally aware of the details of the ongoing Franklin investigation. See Hensley, 469 U.S. at 229–32, 105 S.Ct. at 680–82 (police without specific knowledge of facts supporting flyer or bulletin issued concerning suspects may nonetheless rely on the flyer or bulletin to supply reasonable suspicion justifying an investigatory stop). He stated that he specifically knew that McCarthy and Hunter were suspects in a series of bank robberies, that the two men were suspected to be living together in the area, that McCarthy was falsely using the name John E. Perry, and that an arrest warrant existed for Hunter. Moreover, Fulmer testified that he knew that the Isuzu truck was registered to a "John E. Perry," and that he believed that person to be the John E. Perry under suspicion by the FBI. These facts alone arguably give rise to a reasonable suspicion sufficient to justify a brief investigatory stop of McCarthy. More importantly, adding to this collection McCarthy's presence at the scene following Hunter's flight significantly heightened

finding, see United States v. Infante–Ruiz, 13 F.3d 498, 503 (1st Cir.1994) ("[G]overnment bears burden of showing, by reference to 'demonstrated historical facts' and by a preponderance of the evidence, that the information or item would inevitably have been discovered by lawful means."), we think it likely that, in the normal course of the investigation, the government would have inevitably discovered James Hall. Indeed, James Hall's brother, Lance, rented the Pontiac Sunbird. Trooper Heller obtained this information and the fact that Hunter was listed as a driver on the rental agreement solely on the basis of the car's license plate number. It is true that the record lacks any evidence clearly establishing that the police would have possessed the license plate number absent the stop, or that, during the normal course of the investigation, officers would have spoken to Lance Hall and necessarily have made the connection to his brother James. Nonetheless, we do not think it is unduly speculative to infer that such events would have occurred. Had the police spoken to Lance Hall, it is at least arguably reasonable that he would have directed them to his brother James, who also knew Hunter and lived in the vicinity of the Franklin robbery.

the suspicion concerning McCarthy's involvement. Thus, we find no error in the district court's finding.

Furthermore, we note that Deputy Fulmer testified that, at the time he ordered the stop, he did not definitely know whether McCarthy or Hunter was driving the truck or whether Hunter was a passenger. Clearly, it was conceivable that Hunter, after initially fleeing on foot, could have run to, and continued his escape in, McCarthy's Isuzu pickup truck. Thus, independent of his suspicion about McCarthy's involvement in the robberies, Fulmer could justifiably have ordered the stop simply to determine whether or not Hunter was inside the truck.

■ Second, we find no error in the finding that probable cause to hold McCarthy arose shortly after the initial stop. Under Alabama state law it is an offense to provide illegal identification to a police officer. Ala. Code § 13A–9–18.1 ("Giving of false name or address to a law enforcement officer."); cf. Ala.Code § 13A–9–18 ("Criminal impersonation."). Fulmer testified that, at the time of the arrest, he knew McCarthy's identification of himself as Perry was false and that such identification violated Alabama state law. Thus, once McCarthy provided his driver's license to the trooper who stopped him, sufficient probable cause arose to take him into custody. We find no clear error in the district court's crediting this testimony or in holding that it provided a sufficient basis for detaining McCarthy.

### 4. Seizure of McCarthy's Two Suitcases

McCarthy also challenges the seizure of his two suitcases. McCarthy contends that the district court erroneously found that the seizure of the weapons and the other items discovered in his maroon suitcase properly came within the "plain view" exception to the warrant requirement. He argues that the incriminating nature of the evidence was not immediately apparent to Deputy Fulmer. McCarthy also contends that no credible evidence established that he owned the seized weapons or that they were actually found in his suitcase. With respect to his second suitcase, McCarthy argues that the district court erred in finding that he had no expec-

tation of privacy in the American Tourister suitcase. McCarthy maintains that, though he left the suitcase in Henderson's trailer, he left it closed and locked. Moreover, he contends that he had not abandoned the suitcase because he intended to retrieve it later in the evening on the day of his arrest. We find these arguments unpersuasive.

■ To satisfy the "plain view" exception to the warrant requirement, the government must show that (1) the law enforcement agent was legally in a position to observe the seized evidence, and (2) the incriminating nature of the evidence was "immediately apparent" to the officer. See United States v. Giannetta, 909 F.2d 571, 578 (1st Cir.1990). The incriminating nature of the evidence is "immediately apparent," if the officer, upon observing the evidence, has probable cause to believe the item is contraband or evidence of a crime. Id. "A practical nontechnical probability that incriminating evidence is involved is all that is required." Texas v. Brown, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (quotations omitted).

■ While it is true that the district court failed to make an explicit finding on the "immediately apparent" prong, the oversight matters little in the context of this case. Deputy Fulmer knew that McCarthy, along with Hunter, was a suspect in a series of armed bank robberies. Without question, the automatic weapons, ammunition and bullet-proof vest were all potential instrumentalities of such crimes. We think a finding that the incriminating nature of the evidence was immediately apparent to Fulmer, implicit in the district court's refusal to suppress the weapons and other items seized from the suitcase, is clearly supported by the record.

■ We also find little merit in McCarthy's contention that no credible evidence established that he owned the weapons and other items seized or that they were actually in his suitcase prior to its being opened. As an initial matter, we note that McCarthy's contention is more appropriately considered as an attack on the relevancy of the seized weapons rather than a fourth amendment issue. If, as McCarthy contends, he did not own the weapons and did not store them in

his suitcase, then the seizure does not violate his fourth amendment rights because it did not intrude on his privacy. *See Sanchez*, 943 F.2d at 112–13 (Fourth Amendment rights are personal). On the other hand, if McCarthy's allegation that he did not own or possess the weapons and other items is true, then they would not have been relevant as evidence in his criminal trial. *See* Fed. R.Evid. 401 (evidence is relevant if it tends to make a disputed fact more or less probable). When, as here, the relevancy of specific evidence turns on a condition of fact—whether the suitcase actually contained the seized weapons and other items—a court shall admit it subject to the introduction of evidence sufficient to fulfill that condition. Fed. R.Evid. 104(b); *United States v. Trenkler*, 61 F.3d 45, 53 (1st Cir.1995).

While Gene Ellison, the person who purportedly cut the lock off the maroon suitcase, did not testify at the suppression hearing, we think the evidence adequately supports the conclusion that the items seized were in the suitcase prior to its opening. Henderson testified that, although Ellison took the padlock off the suitcase while he was in the other room, he, not Ellison, rummaged through the suitcase and found the weapons and the bulletproof vest. Moreover, Henderson testified that the suitcase was extremely heavy and that he needed Ellison's assistance to move it from the back room of his trailer. These facts reasonably support the inference that the weapons and other items were in the suitcase prior to Ellison's removal of the lock. Furthermore, that the items were in the suitcase, reasonably supports the inference that they belonged to McCarthy.

■ Finally, we find no clear error in the court's finding that McCarthy had no legitimate expectation of privacy in the contents of the American Tourister suitcase. Based on Henderson's testimony, the district court supportably found that McCarthy left the suitcase unlocked and open in the back room of Henderson's trailer, a room to which

McCarthy did not have exclusive access. Thus, McCarthy clearly had assumed the risk that Henderson might consent to a search of the room (and that the search would extend to any items, like the suitcase, sitting open in plain view). *See, e.g., United States v. Hall*, 979 F.2d 77, 79 (6th Cir.1992), *cert. denied*, 507 U.S. 947, 113 S.Ct. 1357, 122 L.Ed.2d 736 (1993). Moreover, McCarthy's legitimate expectation argument is further undercut by the fact that he left the open suitcase in Henderson's trailer after Henderson told McCarthy that he and Hunter had to leave. *Cf. United States v. Rahme*, 813 F.2d 31, 34–35 (2d Cir.1987) (hotel guest had no expectation of privacy in luggage left in room when, because of his arrest, he defaulted on rent due).[11]

### B. Sentencing Issues

We now turn to the issues Hunter and McCarthy raise concerning their respective sentences. Hunter complains that the district court unfairly sentenced him to a mandatory five-year sentence under 18 U.S.C. § 924(c) while simultaneously enhancing his total offense level for brandishing a firearm during and in relation to the Connecticut and Alabama robberies. Hunter also contends that the district court erroneously ordered his entire federal sentence to run consecutively to his unexpired state sentence. McCarthy contends that the district court incorrectly sentenced him as an armed career criminal under 18 U.S.C. § 924(e). We discuss each argument below.

#### 1. Standard of Review

■ In the sentencing context, we review factbound matters for clear error, and such facts need only be supported by a preponderance of the evidence. *United States v. Andujar*, 49 F.3d 16, 25 (1st Cir.1995). When the sentencing issues involve questions of law, including the applicability of a relevant guideline, our review is *de novo*. *Unit-*

---

**11.** McCarthy also challenges the search of his Isuzu pickup truck, arguing that it was the fruit of his illegal arrest and the illegal search of his maroon suitcase. Because we find no error in either his initial arrest or the search of the suitcase, we find no error in the search of the truck.

Furthermore, we also reject McCarthy's final challenge concerning the search of his storage shed in Maine because it is likewise substantially predicated on the assumption that the earlier arrest and seizures were illegal.

*ed States v. St. Cyr,* 977 F.2d 698, 701 (1st Cir.1992). Within certain limits, decisions to impose concurrent or consecutive sentences are committed to the judgment of the sentencing court, and such decisions are reviewed only for an abuse of discretion. *See United States v. Whiting,* 28 F.3d 1296, 1310 (1st Cir.), *cert. denied,* —— U.S. ——, ——, ——, ——, 115 S.Ct. 378, 498, 499, 532, 130 L.Ed.2d 328, 408, 435 (1994).

### 2. *Hunter's Sentencing Issues*
#### a. *Brandishing Enhancement*

Section 2K2.4 of the Sentencing Guidelines provides, *inter alia,* that a person convicted under 18 U.S.C. § 924(c) shall be sentenced to a term of imprisonment as required by the statute. U.S.S.G. § 2K2.4(a).[12] In turn, 18 U.S.C. § 924(c) specifies that any individual convicted of using a firearm during and in relation to a crime of violence or a drug trafficking crime shall be sentenced to a mandatory term of at least five years in prison to be served consecutively to any other punishment. 18 U.S.C. § 924(c). Application Note 2 to U.S.S.G. § 2K2.4 adds that:

> Where a sentence under [§ 2K2.4] is imposed in conjunction with a sentence for an underlying offense, any specific offense characteristic for the possession, use, or discharge of an explosive or firearm ... is not to be applied in respect to the guideline for the underlying offense.

U.S.S.G. § 2K2.4, comment. (n. 2). Thus, where a defendant receives a mandatory consecutive sentence for use of a firearm during a crime of violence, pursuant to 18 U.S.C. § 924(c), a court should not also enhance the defendant's base offense level for the underlying crime of violence to account for the use of the firearm. *Id.; see also* U.S.S.G. § 3D1.1, comment. (n. 1).

In this case, the district court treated, for sentencing purposes, the conspiracy to commit the Alabama, Connecticut and Maine bank robberies in Count One as three separate counts of conspiracy to commit the three separate bank robberies. *See* U.S.S.G. § 1B1.2(d) ("A conviction on a count charging a conspiracy to commit more than one

offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit."). Accordingly, the court calculated a separate base offense level for each conspiracy and then combined these levels together to produce a single total offense level. *See* U.S.S.G. § 3D1.4. In calculating the separate base offense levels for the conspiracies to commit the Alabama and the Connecticut robberies, the district court—in both instances—applied a five-level enhancement for brandishing a firearm. U.S.S.G. § 2B3.1(b)(2)(C). Because the § 924(c) charge related to the Maine bank robbery, however, the district court did not apply the brandishing enhancement when calculating the base offense level for that conspiracy. *See* U.S.S.G. § 2K2.4, comment. (n. 2).

Hunter contends that the district court erred in its calculation, contending that it should not have separated the Alabama and Connecticut robberies from the Maine robbery in determining whether to apply the brandishing enhancement. Hunter argues that Application Note 2 to § 2K2.4 clearly states that where the § 924(c) sentence is imposed "in conjunction with a sentence for the underlying offense" no enhancement may be applied, and, in this case, the underlying offense was collectively the entire conspiracy to commit the three bank robberies. Therefore, Hunter concludes, the district court should not have applied the brandishing enhancement to the conspiracies to commit the Alabama and Connecticut robberies because they were part of the "underlying offense." We do not agree.

■ We decline Hunter's invitation to read the phrase "the underlying offense" in Application Note 2 to preclude the application of the brandishing enhancements to the conspiracies to commit the Alabama and Connecticut robberies. First, § 1B1.2(d) clearly instructs the sentencing court to treat a count charging a conspiracy to commit multiple offenses as separate counts of conspiracy for each offense the defendant con-

---

**12.** All guidelines' citations, unless otherwise indicated, are to the November 1994 Guidelines Manual, the manual in effect on the date of sentencing. *See* U.S.S.G. § 1B1.11.

spired to commit. U.S.S.G. § 1B1.2(d); *see also* U.S.S.G. § 3D1.2, comment. (n. 8). Thus, it is clear that the Sentencing Commission does not consider, for the purposes of applying the guidelines, a conspiracy to commit multiple offenses as constituting one single integrated offense.

Moreover, the district court's application of the brandishing enhancement does not undercut the purposes of Note 2. Application Note 2 is intended to prevent double counting. *See* U.S.S.G. § 2K2.4, comment. (backg'd) ("To avoid double counting, when a sentence under this section is imposed in conjunction with a sentence for an underlying offense, any specific offense characteristic for explosive or firearm discharge, use, or possession is not applied in respect to such underlying offense."). In this case, no double counting occurred. Hunter's conviction under § 924(c) was for using or carrying the firearm during and in relation to the Maine robbery, and the district court carefully eschewed applying the brandishing enhancement when calculating the offense level for Hunter's conspiracy to commit that offense. The court applied the brandishing enhancement only when calculating the offense levels relating to the Alabama and Connecticut robberies. Thus, the same conduct did not unfairly give rise to both a sentencing enhancement and a separate mandatory sentence under 18 U.S.C. § 924(c).

### b. Consecutive or Concurrent Sentences

In 1988, Hunter pled guilty in Connecticut state court to possession of cocaine with intent to sell. As a result, he was sentenced to a term of ten years in state prison. After serving three years, the balance of Hunter's sentence was suspended and he was released on three years probation. Hunter was still on probation at the time of the Franklin robbery. Shortly after the Franklin robbery occurred, an order charging Hunter with violation of probation was issued, and, ultimately, on November 16, 1993, a Connecticut state court revoked Hunter's probation and sentenced him to seven-years imprisonment (apparently the unexpired portion of his suspended ten-year sentence for cocaine possession). At the time of sentencing in this case, Hunter was serving the remainder of his Connecticut prison term.

At Hunter's federal sentencing, the district court ruled that his entire federal sentence should run consecutively to his state sentence. In so ruling, the court relied on U.S.S.G. § 5G1.3(c), which provides that

> the sentence for the instant offense shall be imposed to run consecutively to the prior undischarged term of imprisonment to the extent necessary to achieve a reasonable incremental punishment for the instant offense.[13]

The court effectively held that, because the state sentence stemmed not just from the underlying cocaine offense but also from the separate probation violation, the federal sentence should run consecutively to the state sentence in order to insure the necessary incremental punishment.

On appeal, Hunter contends that, in applying subsection (c) and sentencing Hunter to a wholly consecutive federal sentence, the district court erred because it failed to follow the method outlined in Application Note 3 to § 5G1.3 for calculating the appropriate incremental punishment. Note 3 provides that:

---

13. The district court correctly ruled that neither § 5G1.3(a) or (b) governed Hunter's sentencing. In relevant part, U.S.S.G. § 5G1.3 provides:

§ 5G1.3 *Imposition of a Sentence on a Defendant Subject to an Undischarged Term of Imprisonment*

(a) If the instant offense was committed while the defendant was serving a term of imprisonment (including work release, furlough, or escape status) or after sentencing for, but before commencing service of, such term of imprisonment, the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment.

(b) If subsection (a) does not apply, and the undischarged term of imprisonment resulted from offense(s) that have been fully taken into account in the determination of the offense level for the instant offense, the sentence for the instant offense shall be imposed to run concurrently to the undischarged term of imprisonment.

(c) (Policy Statement) In any other case, the sentence for the instant offense shall be imposed to run consecutively to the prior undischarged term of imprisonment to the extent necessary to achieve a reasonable incremental punishment for the instant offense.

[t]o the extent practicable, the court should consider a reasonable incremental penalty to be a sentence for the instant offense that *results in a combined sentence of imprisonment that approximates the total punishment that would have been imposed under § 5G1.2* (Sentencing on Multiple Counts of Conviction) *had all of the offenses been federal offenses* for which sentences were being imposed at the same time.

U.S.S.G. § 5G1.3, comment. (n. 3) (emphasis added); *see also United States v. Whiting,* 28 F.3d 1296, 1310–11 (1st Cir.1994) (plain error for sentencing court to impose federal sentence wholly consecutive to state sentence without attempting to compute the proper equivalent total punishment called for by Note 3). Thus, Hunter contends that, before sentencing him to a wholly consecutive sentence, the district court should have calculated the sentence he would have received if the revocation of probation and the instant bank robbery offenses had all been federal offenses for which he was sentenced at the same time. We disagree.

■■ First, as noted, § 5G1.3(c) instructs the district court, in cases where it applies, to sentence defendants to consecutive sentences "to the extent necessary to achieve a reasonable incremental punishment." Then, Application Note 3 prescribes a method for calculating the "reasonable incremental punishment" that we have recognized applies in "a good many of the cases likely to arise under subsection (c)." *United States v. Gondek,* 65 F.3d 1, 3 (1st Cir.1995). Implicit in this recognition, however, is the fact that, although the method applies in a "good many cases," it does not cover every case. Indeed, as Application Note 3 itself explains, the methodology it prescribes is intended only "to assist the court in determining the appropriate sentence." U.S.S.G. § 5G1.3, comment. (n. 3); *cf. id.* (cautioning that method should be followed only "[t]o the extent practicable"). Therefore, while it is evident that a sentencing court should initially look to Note 3 for guidance in calculating an appropriate incremental punishment, it nonetheless has discretion to follow a different course in a small number of cases where adherence to Note 3 would be impracticable

and result in an inappropriate incremental punishment. *See, e.g., United States v. Brassell,* 49 F.3d 274, 278 (7th Cir.1995) (court has discretion in appropriate circumstances to disregard methodology outlined in Note 3), *United States v. Torrez* 40 F.3d 84, 87 (5th Cir.1994) (same).

■■ In this case, the district court did not err by following a different course. First, it is far from clear how, and if, Application Note 3 applies to the facts of this case. None of the four detailed examples outlined in Note 3 explain how to sentence a defendant who is serving out a term following the revocation of probation. *See* U.S.S.G. § 5G1.3, comment. (n. 3). Moreover, the text of Note 3 instructs that the incremental punishment should be calculated according to the grouping rules set forth in § 5G1.2. Section 5G1.2 (and the other sections to which it refers), however, does not discuss how to handle a sentence imposed following a probation revocation. The guidelines do discuss sentences imposed for probation violations separately under U.S.S.G. Ch. 7. Significantly, Application Note 5 to U.S.S.G. § 7B1.3 instructs that

> it is the Commission's recommendation that any sentence of imprisonment for a criminal offense that is imposed after revocation of probation or supervised release be run consecutively to *any term of imprisonment* imposed upon revocation.

U.S.S.G. § 7B1.3, comment. (n. 5) (emphasis added). If anything, Note 5 suggests that the course followed by the district court, imposing a wholly consecutive sentence, was correct. *See Torrez,* 40 F.3d at 87–88 (Section 7B1.3 suggests that—as in this case—notwithstanding Note 3 to § 5G1.3, imposition of wholly consecutive sentence would be appropriate in case involving a probation revocation).

Furthermore, Application Note 3 fails to explain whether, in a situation like the present, a court should consider the underlying state drug conviction in calculating the equivalent federal sentence. In his argument, Hunter ignores the underlying drug possession and contends that Note 3 requires the court to combine only the guideline sentence

for federal probation revocation with the guideline sentence for the instant bank robbery charges. Such an approach, however, fails to account for the fact that, in sentencing Hunter to the unexpired portion of his suspended ten-year drug sentence, the state court arguably aimed to punish Hunter for both the probation violation and the underlying cocaine possession. *Cf. United States v. Gullickson*, 981 F.2d 344, 346–47 (8th Cir. 1992) (instructing sentencing court to calculate appropriate incremental punishment by estimating equivalent federal sentence for state forgery and other offenses and combining that with the sentence for instant federal offense where defendant, at the time of sentencing, was serving state prison term following revocation of probation imposed for state forgery conviction; court notably did not instruct sentencing court to estimate federal penalty for probation violation).

Finally, we note that Hunter's case is unlike the usual situation governed by § 5G1.3(c), in which the offenses supporting the separate sentences arise from related conduct. *See Gondek*, 65 F.3d at 3. In such cases (*e.g.*, a state drug charge and a related federal firearms charge), sentencing according to the grouping rules as suggested by Application Note 3 makes much sense. In other words, when the federal sentence arises from conduct or acts directly related to that on which the state sentence is based, application of the guidelines' grouping rules accords with fairness principles inherent in the guidelines by "limit[ing] the significance of the formal charging decision and . . . prevent[ing] multiple punishment for substantially identical offense conduct." U.S.S.G. Ch. 3 Pt. D, intro. comment. Hunter's situation, however, is different. The federal bank robbery convictions arise from conduct completely unrelated to the cocaine possession

that lies at the heart of the state sentence. In cases like Hunter's, where the acts or conduct giving rise to the different sentences are not closely related, the rationale of the guidelines' grouping rules does not apply. Indeed, Hunter's situation is more "closely akin to the case of the defendant who commits a new offense while still in prison, the very situation in which [U.S.S.G. § 5G1.3(a) ] instructs that the new sentence is to be served consecutively." *Gondek*, 65 F.3d at 3.

Accordingly, we do not believe that the method for calculating a "reasonable incremental punishment" prescribed in Application Note 3 clearly addresses Hunter's situation. In short, it would not have been "practicable" in light of the inconsistencies outlined above for the district court to have attempted to follow Note 3, and, thus, it did not err in failing to do so. Moreover, we do not think the court otherwise abused its discretion in sentencing Hunter to a wholly consecutive federal sentence. The court carefully considered the circumstances of this case and determined that such a sentence was necessary in order to insure a reasonable incremental punishment for the federal bank robbery charges.

Furthermore, we believe the Sentencing Commission's adoption in 1993 of Application Note 4 to U.S.S.G. § 5G1.3 implicitly supports this conclusion. In cases where a defendant has committed a federal offense while on probation, Note 4 expressly limits a district court's discretion in determining a reasonable incremental punishment by providing that the court must order the entire federal sentence to run consecutively to any sentence imposed upon revocation of probation. *See* U.S.S.G. § 5G1.3, comment. (n. 4).[14] Significantly, the Sentencing Commission added Note 4 to § 5G1.3 without altering in any way the language of Application

---

14. In order to avoid any *ex post facto* concerns, the district court expressly declined to rely on Application Note 4, enacted November 1, 1993 (prior to sentencing but after the underlying criminal acts), which provides:

4. If the defendant was on federal or state probation, parole, or supervised release at the time of the instant offense, and has had such probation, parole, or supervised release revoked, the sentence for the instant offense

should be imposed to be served consecutively to the term imposed for the violation of probation, parole, or supervised release in order to provide an incremental penalty for the violation of probation, parole, or supervised release (in accord with the policy expressed in §§ 7B1.3 and 7B1.4).

U.S.S.G. § 5G1.3, comment. (n. 4). We also find it unnecessary to rely on Note 4, and, thus, do not consider whether it poses any significant *ex post facto* concerns.

Note 3. Thus, in doing so, the Commission implicitly recognized that, prior to the adoption of Note 4, a sentencing court at the very least had the discretion in cases like Hunter's (*e.g.*, probation revocation cases) to ignore the methodology set forth in Note 3 and order a wholly consecutive sentence.

### 3. McCarthy's Sentencing Issue

 Finally, McCarthy challenges the district court's use of his seven prior state attempted-murder convictions as a single predicate offense in determining whether he was subject to sentencing as an armed career criminal under 18 U.S.C. 924(e). McCarthy contends that the district court should not have considered the attempted-murder convictions because they arose out of the same incident that gave rise to a "non-qualifying" bank larceny conviction.[15] We do not agree.

As the government explains, the sentencing court did not count the larceny conviction as a separate predicate offense, but instead counted only the state attempted-murder convictions (and the court counted those only as a single predicate offense). Thus, the district court did not consider an arguably non-qualifying predicate offense (i.e., the bank larceny conviction) in determining whether it should sentence McCarthy as an armed career criminal. McCarthy's implicit contention that, whenever the same conduct gives rise to both qualifying and non-qualifying convictions, a sentencing court may consider neither in determining whether defendant qualifies as an armed career criminal is completely without logic or support. Accordingly, McCarthy's complaint lacks merit.

### III.

### Conclusion

For the foregoing reasons, we **affirm**.

---

**15.** 18 U.S.C. § 924(e) provides, *inter alia*, that an individual shall be sentenced as an armed career criminal if he or she has violated 18 U.S.C. § 922(g) (unlawful possession of a firearm) and has three previous convictions by any court for a violent felony, serious drug offense or both, committed on occasions different from one another. In this case, the district court held that McCarthy's federal bank larceny conviction did not qualify as a violent felony. We have no need to review that decision.