UNITED STATES of America, Plaintiff,

v.

Luis **FERNANDEZ SANTANA,**
et al., Defendants.

**Crim. No. 97–37(SEC).**

United States District Court,
D. Puerto Rico.

July 31, 1997.

Joseph V. Hoffer, Asst. U.S. Atty., U.S. Attorney's Office, Hato Rey, PR, for Plaintiff.

Rafael F. Castro–Lang, San Juan, PR, Fernando J. Carlo–Gorbea, Graham A. Castillo–Pagán, Luis R. Rivera–Rodríguez, Ester Castro–Schmidt, Hato Rey, PR, Federal Public Defender Office, Hato Rey, PR, Juan F. Matos–de–Matos, Matos Bonet & Matos de Juan, San Juan, PR, for Defendants.

## OPINION AND ORDER

CASELLAS, District Judge.

Pending before the Court is a motion to suppress and to dismiss the indictment filed by defendant Luis Fernandez Santana. **(Docket # 64)** Codefendants Miguel Rodriguez Colón and Marta Berrocal Diaz joined in the motion filed by defendant Fernandez Santana. **(Docket # 69)** The Court held a hearing on the motion to suppress on July 1 and 2, 1997. Upon careful consideration of the witnesses' testimony, the parties' arguments and the applicable law, defendants' motion to suppress and dismiss the indictment is **DENIED IN PART AND GRANTED IN PART.**

### Facts

On March 3, 1997, members of the Drug Enforcement Administration (DEA) and the U.S. Custom Service (Customs) seized approximately 16 kilograms of cocaine in a joint effort in San Juan, Puerto Rico. Members of the DEA task force and the U.S. Customs Service combined their efforts to search and seize a cache of narcotics aboard the sailing vessel, the Eagle Caribe, and to determine the identity of the ultimate recipients of the contraband.

DEA task force agent Miguel Angel Andaluz Baez ("agent Andaluz") had received information from Mauricio Guerrero Satecna ("Mauricio Guerrero") that a certain amount of cocaine was on board the Eagle Caribe, located at the first gate in the Pan–American Pier, in San Juan, Puerto Rico. Acting pursuant to this information, task force agents boarded the vessel and seized 16 kilos of cocaine, during the early afternoon hours on March 3, 1997. Upon further inspection of the crew and the vessel, task force agents identified one of the crew members, Juanito Fiel, as the person responsible for delivering the contraband.

After his arrest, Juanito Fiel cooperated with the task force agents. He provided a profile of one "Mauricio" that resembled the description of Mauricio Guerrero Satecna. Juan Fiel also provided a phone number known to task force members as a phone number for Guerrero. Fiel placed a recorded phone call to "Mauricio." Some person answered the call and arranged the details of the delivery of the contraband. According to agent Andaluz, Guerrero had informed him that the cocaine shipment from the Eagle Caribe would be delivered to Miguel Rodriguez Colón, and described him as a man of average height and dark skin, in good physical condition. Guerrero had informed Agent Andaluz that Rodriguez Colón had received several shipments of cocaine in the latter part of 1996, and that Rodriguez Colón was supposed to receive a drug shipment that had been seized on February 4, 1997. Guerrero told Agent Andaluz that on February 27, 1997, he had met with Rodriguez Colon in front of the Black Angus, a prostitution establishment located in the Miramar area in Santurce, Puerto Rico. On February 27, 1997, Guerrero had also been accompanied by a person called Luis, described as a short, stocky man—over 200 pounds—who drove a rented four-door car.

Once the agents seized the cocaine on March 3, 1997, Agent Andaluz called Guerrero and informed him that no drugs had been seized, and "to stay home and not go anywhere." The agent misled Guerrero about the seized drugs because he felt that Guerrero had failed to inform him about previous cocaine shipments, and wanted to avoid unnecessary danger for the agents who were going to undertake the undercover operation later that night.

That afternoon, between 3 p.m. and 6 p.m., agent Andaluz sent several agents to set up a surveillance at Mauricio Guerrero's house and proceeded to the Customs office to prepare an operational plan to arrest the persons who would pick up the cocaine near the Pan–American Pier.

The surveillance agents informed agent Andaluz that there were two vehicles in front of Guerrero's house: a black Eclipse and a red Mitsubishi Mirage. At the time, agent Andaluz remembered Guerrero's tip that on February 27, 1997, one Miguel Rodriguez Colón and another individual named Luis had been inside a four-door red Mirage waiting for a drug shipment near the Black Angus. The agents also saw three persons leave the Guerrero residence and drive away in the red Mirage. Agent Andaluz told them to follow them, since the profile of the driver was similar to the description of one Luis who had previously met with Rodriguez Colón and Guerrero.

Juanito Fiel made a controlled delivery to Gabriel Figueroa Pagán and Joamid Hernandez Cotto at approximately 9:00 p.m. in the premises near the Pan–American Pier. Prior to the arrest of Figueroa Pagán and Hernandez Cotto task force agents overheard these defendants requesting Fiel to accompany them to the area near the Black Angus where the other persons where waiting so they would be paid for the drug shipment. Upon being informed of this tip, agent Andaluz proceeded to drive near the Black Angus area to identify the persons in that location.

At approximately 9:15 p.m. Agent Andaluz drove past the Black Angus with several other agents. Agent Nieves, who had conducted surveillance of Guerrero's house that afternoon, also followed Andaluz in another car. As the agents drove through the Black Angus area, agent Nieves informed Andaluz through his car radio that the red Mirage he had seen at Guerrero's residence and the driver of that car was near a topless bar— the Hawaiian Hut—not very far from the Black Angus area. The driver of the car was

apparently accompanied by several other persons.

When agent Andaluz drove near the area described by agent Nieves, he immediately recognized Mauricio Guerrero. He was intrigued about meeting Guerrero in that location, since he had expressly ordered him to remain in his house. Andaluz also saw two other persons. One person he believed to be Miguel Rodriguez Colon, based on the description previously provided by Guerrero. He also identified the individual called Luis, as the person that had met Guerrero and Rodriguez Colón several days before in front of the Black Angus. Luis was also the same person that Agent Nieves had identified as the driver of the red Mirage who had been at Guerrero's house that same afternoon. According to agent Andaluz, Guerrero, Miguel Rodriguez Colón and Luis were very close to each other and engaged in conversation.

Agent Andaluz stepped down from his car, along with four other agents, and approached the three individuals he had identified. When he came closer, he spotted defendant Marta Berrocal inside the red Mirage and asked her to step out of the car. Agent Andaluz asked the defendants to make their hands visible. Agent Andaluz had his gun drawn, although not directly pointed at the defendants. He first asked Miguel Rodriguez Colón his name, address, and the reason why he was in the area. Rodriguez Colón gave his correct name and told the agent he was going to the Hawaiian Hut with his friends Guerrero and Fernandez Santana. When agent Andaluz confronted him with the unlikely prospect of bringing his wife, Marta Berrocal, to a topless bar, he changed his answer and replied that he was just talking to his friends.

Agent Andaluz then addressed Ms. Marta Berrocal, and asked her name, address, and the reason why she was in the area. She gave her name and address and told the agent that her husband, Miguel Rodriguez Colón, had invited her to go for a ride. She denied that she and her friends were going to a topless bar.

The agent next questioned Guerrero, who provided his name and address, and told him that he was just talking to his friends, Rodri-guez Colón, Luis Fernandez Santana and Marta Berrocal. Finally, Andaluz questioned Luis Fernandez Santana, who initially refused to provide his full name and his exact address. Fernandez Santana at first explained that he was alone, then said that he was with Miguel Rodriguez Colón and Marta Berrocal, but not with Guerrero.

At that time, an argument ensued between Fernandez Santana and Rodriguez Colón regarding whether they were together or not, and Rodriguez Colón advised Fernandez Santana to cooperate. At that time. agent Andaluz proceeded to arrest Mauricio Guerrero, Miguel Rodriguez Colón, Luis Fernandez Santana and Marta Berrocal. Without reading them their *Miranda* rights, the agent inquired whether there was anything within the vehicle that was extremely valuable, or whether there was a considerable amount of money, drug or weapons. Fernandez Santana said he had custody over the vehicle and that he had approximately $26,-000.00 in the back part of the car, where Marta Berrocal had been sitting. Agent Andaluz examined the back part of the car, where he found a shoe box with the money. After the agents handcuffed Fernandez Santana and placed him inside the car, agent Andaluz placed the box next to Fernandez Santana's legs.

All the defendants were handcuffed, placed in the official vehicles and driven to the DEA office in Isla Verde, Puerto Rico. Once in the office, agent Ruben Sanchez read defendants their *Miranda* rights and placed them in separate cells. Agents Ruben Sanchez, Javier Alvarez and Jose Rolón then took defendant Fernandez Santana to an interrogation room to count the money seized from him. Agent Andaluz explained that when a person is transferred from the cell to the interrogation room, his or her belongings go with him. "The idea behind this", Andaluz noted, "is that at all times he [the arrested person] has possession or visible custody of his belongings." Once in the interrogation room, the agents made an inventory of his belongings to prevent future claims of theft from the police. The agents also followed the same procedure for defendants Miguel

Rodriguez Colón, Mauricio Guerrero and Marta Berrocal.

After the interrogation of Fernandez Santana, but while still under custody of the DEA agents, one of the agents started to return Fernandez Santana's property, which included a beeper and a cellular phone. However, the agent examined Fernandez Santana's wallet before he had returned it to him and found a small yellow note, which described an individual resembling Juanito Fiel and identified the Eagle Caribe. Once the note was found, the agent informed agent Andaluz, who then ordered the other agent to read Fernandez Santana his *Miranda* rights for the second time, and retained custody over him.

Defendants seek to suppress the evidence obtained from them and to dismiss the indictment. They claim that the agent Andaluz conducted a custodial interrogation without advising the defendants of their *Miranda* rights, and thus any statements proffered pursuant to that interrogation are inadmissible. Defendants also argue that the agents lacked probable cause to arrest the defendants, and accordingly, any evidence obtained pursuant to that illegal arrest should be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We examine each of the arguments seriatim.

### Applicable Law/Analysis

### Investigatory Stop/Reasonable Suspicion

Defendants claim that agent Andaluz's initial questioning of the defendants in the area near the Hawaiian Hut prior to their formal arrest constituted a custodial interrogation which triggered the obligation to read defendants their *Miranda* rights. Consequently, defendants seek to suppress all of the defendants' statements prior to the arrest, as well as the evidence obtained subsequent to the arrest, pursuant to the agents' failure to provide the constitutionally-required *Miranda* warnings.

The Court must determine whether the questioning of the defendants was conducted within the context of an investigatory stop, and thus did not require the agent to read *Miranda* warnings, or whether the agents'

behavior towards defendants constituted a *defacto arrest*, which would trigger the *Miranda* rights.

The First Circuit has spoken repeatedly on the distinction between an investigatory stop and an arrest. In *U.S. v. Young*, 105 F.3d 1 (1st Cir.1997), the Circuit faced an analogous situation. On April of 1994, two police officers, while patrolling a section of Boston, received a radio message describing three individuals suspect of armed robbery. Several blocks from the last reported location of the suspects, the officers noticed a group of three men standing together. When the group detected the unmarked cruiser, the group dispersed in separate directions. When the police noticed that one of the men's height and clothing matched the profile of one of the robbery suspects, they drove their car next to the man, Dwayne Young, and asked him "if he had a minute," to which Young assented. Once one of the officers detected a gun in Young's waistband, he lunged towards the defendant, and made fleeting contact with his jacket or belt, but failed to either grab the gun or detain him. Young fled from the police, who eventually detained him.

At trial, Young sought to suppress the gun, claiming that the officer's "got a minute" question and contact with the defendant constituted a *de facto* arrest without providing adequate *Miranda* warnings. The district court determined that the officer's question and minimal contact did not constitute a *de facto arrest* and denied the motion. Upon appeal, the First Circuit upheld the denial of the motion to suppress.

The First Circuit explained: "Interaction between law enforcement officials and citizens generally falls within three tiers of Fourth Amendment analysis, depending on the level of police intrusion into a person's privacy. The first or lowest tier encompasses interaction of such minimally intrusive nature that it does not trigger the protections of the Fourth Amendment. The Supreme Court has repeatedly emphasized that not all personal intercourse between the police and citizens rises to the level of a stop or seizure. *See Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d

389 (1991)(citing cases). Police may approach citizens in public spaces and ask them questions without triggering the protections of the Fourth Amendment. (citations omitted)." *Id.* at 5–6.

The Court in *Young* continued: "The remaining two tiers of Fourth Amendment analysis comprise *de facto arrests* requiring probable cause, and lesser seizures generally known as investigative or *Terry* stops, which require a lesser reasonable suspicion. An arrest occurs when an officer, acting on probable cause that an individual has committed a crime, detains that individual as a suspect. Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime.(citations omitted) An investigative stop, also known as a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), occurs when a police officer, acting on reasonable and articulable suspicion of criminal activity, briefly detains an individual to confirm or dispel his suspicion." *Id.* at 6 (citing *U.S. v. McCarthy*, 77 F.3d 522, 529 (1st Cir.1996)).

■ With regards to investigative stops, the Court must determine "not whether the police had probable cause to act, but instead whether the actions taken were reasonable under the circumstances." *Id.* The Court must first conclude whether the officer's action was justified at its inception. If the action is justified, the Court must then ask whether the action taken was reasonably related in scope to the circumstances which justified the interference. *Id.* To satisfy the first prong, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Young* at 7 (citing *U.S. v. Kimball*, 25 F.3d 1, 6 (1st Cir.1994)). To fulfill the second prong, the Court must examine the totality of the circumstances. *See United States v. Walker*, 924 F.2d 1, 4 (1st Cir.1991).

■ Based on the above mentioned case law, we conclude that agent Andaluz's brief detention and subsequent questioning of defendants Miguel Rodriguez Colón, Mauricio Guerrero, Marta Berrocal and Luis Fernandez Santana constituted an investigatory stop, pursuant to *Terry v. Ohio*, which did not trigger the *Miranda* rights. As noted above, agent Andaluz had ample evidence to intervene with the defendants to dispel his suspicion regarding possible criminal activity. The agent had garnered information from Juanito Fiel and the people arrested at the San Juan Pier regarding the pickup point of the cocaine shipment. He also had obtained the profiles of Miguel Rodriguez Colón and Luis Fernandez Santana from a conversation with Guerrero, who had met with the above mentioned defendants on February 27, 1997. The surveillance team had also confirmed the presence of those two individuals at Guerrero's house earlier that day. This evidence was sufficient to provide the agent reasonable suspicion required to engage in an investigatory stop of defendants Guerrero, Fernandez Santana and Miguel Rodriguez Colón.[1]

Defendants claim they were not free to leave, since they were surrounded by agents with their guns drawn when agent Andaluz initially intervened with them. However, it is well-established law that the use of guns and the presence of more than one police officer do not necessarily convert an investigative stop into an arrest. *See U.S. v. Maguire*, 918 F.2d 254, 259 (1st Cir.1990).

The First Circuit recently explained in *Young*:

We have recently rejected the contention that every incidence of physical contact, even *de minimis*, between a police officer and a citizen, constitutes an arrest requir-

---

1. The First Circuit recently noted in *United States v. Meade*, 110 F.3d 190, 193 (1st Cir.1997): "Under the 'fellow-officer' rule, law enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime. *See United*

States *v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) ... Thus, when a law enforcement officer with information amounting to probable cause directs an officer who lacks the knowledge to make the arrest, we 'impute' to the arresting officer the directing officer's knowledge. (citations omitted)."

ing probable cause. *See [U.S. v. ]Zapata,* 18 F.3d [971] at 977 [ (1994) ] (indicating that police touching of an individual does not necessarily elevate a seizure to an arrest.) Parsing whether any given seizure constitutes an arrest or a lesser seizure, however, proves a difficult task. See *id.* at 975 (explaining that no scientific formula exists to distinguish between investigative stops and arrests.) Police conduct will rise to the level of an arrest when " ' a reasonable man in the suspect's position would have understood his position' in the circumstances then obtaining, to be tantamount to being under arrest." See *id.* (quoting *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984)).

*Young,* 105 F.3d at 7.

The Court in *Young* identified several factors that could transform a non-arrest seizure to a *de facto* arrest requiring probable cause. These included: 1) extending an investigative stop beyond the time necessary to confirm or dispel reasonable suspicion, and 2) physically blocking the suspect's exit such that a reasonable person would not feel free to leave. *Id.* at 7–8. Above all else, the First Circuit stressed the fact specific nature of the inquiry. In *Kimball,* 25 F.3d at 6, the First Circuit explained that "whether police activity is reasonable in any particular context depends on the facts which are unique to that incident."

■ Upon review of the totality of the circumstances, the Court concludes that the initial detention of defendants and agent Andaluz's subsequent questioning regarding their name, address and reason for being in that area, did not constitute a *de facto arrest,* but was rather an investigatory stop designed to dispel the agent's reasonable suspicion regarding suspected criminal activity. The questions were brief and were not designed to compel incriminatory answers. A reasonable person would not think that these questions were particularly intimidating.

Furthermore, the fact that the agents had their guns drawn and the presence of several

police officers do not without more, transform the detention into a *de facto arrest.* Although some, if not all of the defendants may have felt apprehensive towards the agents during the initial questioning, the generic nature of the questioning and the fact that such questioning took place in a public area leads us to conclude that such conduct resembles more an investigatory stop as explained in *Berkemer v. McCarty* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). The initial questioning was just long enough to confirm agent Andaluz's reasonable suspicion that the defendants were waiting for the seized cocaine. As noted above, he proceeded to arrest them once defendants Rodriguez Colón and Fernandez Santana started arguing about their contradictory statements to the agents and debating whether they should cooperate with the agents or not. Such questioning lasted no more than several minutes.

Accordingly, we conclude that the officer's brief questioning was justified at its inception, in view of his collective knowledge of the parties' identities and possible motives for being in the area. Moreover, the notoriety of the area where the agent conducted the questioning and the dangerous nature of the purported criminal activity, justified his cautious approach towards the defendants, with his gun drawn and in the company of several fellow agents.[2] We note that the agent conducted his questioning in a casual manner, without yelling or forcibly restraining the defendants. He asked general questions to each and every one of the defendants to dispel the reasonable suspicion he may have harbored towards each and every one of them. Only after he had properly identified the identity of the defendants, assessed the contradictory statements proffered by them and observed the nervous demeanor and subsequent dispute between Rodriguez Colon and Fernandez Santana, he proceeded to arrest them. Accordingly, we find that agent Andaluz conducted an investigatory stop when he initially approached the defendants,

---

**2.** In *United States v. Trullo,* 809 F.2d 108, 113 (1st Cir.1987), the Court took into account the location of the stop, an area notorious for its high crime rate and drug transactions to uphold an officer's display of his gun.

and that there was no need for *Miranda* warnings prior to his brief questioning.

### Probable Cause for Arrest

Defendants also argue that the agents also lacked probable cause to arrest each of them, since the responses given by the defendants did not constitute sufficient justification to arrest them. We disagree.

The First Circuit has recently expounded on the requirements for a warrantless arrest. In *United States v. Meade* 110 F.3d 190, 193 (1st Cir.1997) the Court noted: "A warrantless arrest requires probable cause, the existence of which must be determined in light of the information that law enforcement officials possessed at the time of the arrest. *See United States v. Diallo*, 29 F.3d 23, 25 (1st Cir.1994) 'Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime.' *Young*, 105 F.3d at 6. To establish probable cause, the government 'need not present the quantum of proof necessary to convict.' (citing *United States .v. Uricoechea–Casallas*, 946 F.2d 162, 165 (1st Cir.1991))."

■ As noted above, the agent was armed with his fellow officers' collective knowledge regarding the identities of defendants Guerrero, Fernandez Santana and Rodriguez Colón. He also had reliable information regarding the location of the pick-up point for the seized cocaine shipment from the Eagle Caribe. He addressed each defendant individually and proceeded to arrest them once he confirmed his reasonable suspicion that the defendants were waiting for the seized cocaine. The defendants uttered a series of contradictory statements in response to the agent's queries: defendants first claimed that they were going to the Hawaiian Hut, then that they were just talking, then that they were just going for a ride in their car. With respect to Guerrero, Rodriguez Colón and Fernandez Santana, agent Andaluz had ample probable cause to believe that they had committed a crime, to wit, the attempt to receive the 16–kilogram shipment of cocaine.

Agent Andaluz's collective knowledge of the suspected criminal activity near that area, his confirmation of the identities of Rodriguez Colón, Fernandez Santana and his informant Mauricio Guerrero, the contradictory answers and the ensuing dispute between Rodriguez Colón and Fernandez Santana whether they knew Guerrero and whether they should cooperate with the agent, provided Agent Andaluz sufficient reasons, taken together, to establish probable cause for their arrest.

■ Agent Andaluz also had probable cause to arrest defendant Marta Berrocal. Once the agents ordered her to get out from the back of the car, she claimed that her husband, Miguel Rodriguez Colón, had invited her for a ride, but rejected her husband's contention that they were going to the Hawaiian Hut. Furthermore, she acknowledged that all of the defendants—Rodriguez Colón, Fernandez Santana, Mauricio Guerrero and herself—were together .in the car. This statement belies the allegation that she was an innocent bystander, completely unaware of the drug transaction.

The Supreme Court has clearly stated that probable cause must exist with respect to each person arrested, and a person's mere proximity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. *See Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979). *See also United States v. Sepulveda*, 102 F.3d 1313 (1st Cir.1996). Consequently, defendant Berrocal may also plausibly argue that mere familiarity or kinship with other people for whom there is probable cause to arrest is not sufficient to establish probable cause against her. We must assess not only her mere proximity to the other defendants, but her relationship to them at the time of the arrest. In the present case, the agent was armed with the collective knowledge of his fellow officers that several people would be waiting near the Black Angus area for the cocaine shipment recently seized from the Eagle Caribe. Agent Andaluz had specific knowledge that Mauricio Guerrero, Miguel Rodriguez Colón and Luis Fernandez Santana were linked to a greater or lesser degree

to the cocaine shipment from the Eagle Caribe. Ms. Berrocal voluntarily acknowledged that she was in that area accompanied by her husband, Miguel Rodriguez Colón, as well as Fernandez Santana and Mauricio Guerrero. Although she gave a seemingly innocuous response to agent Andaluz's query, the agent assessed the credibility of her answer against the contradictory statements proffered by the other defendants, and concluded that she was part of the cadre waiting for the drug shipment. As noted in *Sepulveda*, "probable cause requires only that the police have 'reasonable grounds to believe' that [defendant] had committed the crime." 102 F.3d at 1317. We find that the agent had reasonable ground to believe that Marta Berrocal was also waiting for the drug shipment, and thus, had probable cause to arrest her.

Upon review of the facts, we conclude that agent Andaluz had probable cause to arrest defendants Guerrero, Rodriguez Colon, Fernandez Santana and Marta Berrocal.

### Suppression of the Money/Luis Fernandez Santana's Statement Regarding Ownership of the Money

Defendant Luis Fernandez Santana seeks suppression of the $26,000.00 seized from the red Mitsubishi Mirage. Defendant claims that agent Andaluz improperly questioned him regarding the ownership or custody of the money after he was arrested, without advising him of his *Miranda* rights. Thus, since the agents obtained the money pursuant to an incriminating statement made by Luis Fernandez, the Court should suppress both the money and the statement as "fruits of the poisonous tree."

Defendant correctly argues that the Fifth Amendment protection against self-incrimination precludes the government from using statements elicited from a suspect during a custodial interrogation if those statements were extracted without a prior warning. *Illinois v. Perkins*, 496 U.S. 292, 296, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990), *quoting Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). For the Fifth Amendment protection to come into play, however, the statements must be the result of a *custodial interrogation*.

A defendant is said to be in *custody* when he or she is either subjected to a formal arrest or restrained to the degree usually associated with a formal arrest. *United States v. Fernández Ventura*, 85 F.3d 708, 709 (1st Cir.1996), *quoting Thompson v. Keohane*, —— U.S. ——, ——, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995); *Stansbury v. California*, 511 U.S. 318, 323–24, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994). To determine whether a particular restraint on freedom of movement meets this test, the Court "must examine all the circumstances surrounding the interrogation. This test is objective: the only relevant inquiry is 'how a reasonable [person] in the suspect's shoes would have understood this situation'." *Fernández Ventura*, 85 F.3d at 711, *quoting Stansbury*, 511 U.S. at 324, 114 S.Ct. at 1529.

Among the factors which are usually taken into account in determining whether a defendant was in custody are: (a) whether he was questioned in a familiar or neutral surrounding; (b) the number of law enforcement agents that were present at the scene; (c) the degree of physical restraint which was placed upon the subject, i.e., whether the subject was free to leave; (d) and the duration and character of the interrogation. *Fernández Ventura*, 85 F.3d at 711, *quoting United States v. Masse*, 816 F.2d 805, 809 (1st Cir.1987).

A defendant is, on the other hand, said to be under *interrogation* when he or she is subjected to "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Fernández Ventura*, 85 F.3d at 711, *quoting Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). As with the custody determination, the test is objective: the Court must determine whether a reasonable person would, given the same circumstances, perceive such questioning to constitute an attempt to elicit an incriminating response. *Fernández Ventura*, 85 F.3d at 711 (*quoting United States v. Taylor*, 985 F.2d 3, 7 (1st Cir.1993)).

■ It is undisputed that defendant Luis Fernandez Santana was under custody at the time that agent Andaluz questioned the defendants about whether they had money, drugs or weapons in the vehicle. Furthermore, the nature of the question—whether defendants had a considerable amount of money, or whether there were drugs or weapons in the car—clearly suggests that an affirmative answer to this question would be an incriminating response. Indeed, Fernandez Santana claimed ownership of the money in direct response to the agent's query. It is clear to this Court that defendant Fernandez Santana may have hesitated to answer agent Andaluz's question if he had been given a proper *Miranda* warning.

Accordingly, we hold that the agent's questioning of Fernandez Santana immediately after his arrest was improper, since he failed to provide the *Miranda* warnings after he was under custody. Fernandez's statement that he had custody of the $26,000.00 was an incriminating statement made pursuant to agent Andaluz's questioning. Accordingly, the Court **suppresses** Luis Fernandez Santana's statements in which he claims ownership and/or custody of the $26,000.00 seized from the red Mitsubishi Mirage.

The Court, however, declines to suppress the seized cash, pursuant to the "inevitable discovery" doctrine. The First Circuit explained this doctrine in *United States v. Zapata,* 18 F.3d 971 (1st Cir.1994). In that case, appellant claimed that the police officers had improperly seized two duffel bags containing approximately 25 kilograms of cocaine. The Court rejected appellant's plea, noting that the officers had obtained defendant's consent to search and freely surrendered the keys to both the doors and the trunk. Accordingly, it held that the seizure was proper.

Furthermore, it noted that "[e]ven if the defendant's consent were somehow tainted, and the search invalid, suppression would not lie in this instance for the contraband inevitably would have been discovered. Evidence which comes to light by unlawful means nonetheless can be used at trial if it ineluctably would have been revealed in some other (lawful) way, see *Nix v. Williams,* 467 U.S.

431, 448, 104 S.Ct. 2501, 2511, 81 L.Ed.2d 377 (1984); *U.S. v. Infante–Ruiz,* 13 F.3d 498, 503 (1st Cir.1994), so long as (i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment. *See United States v. Silvestri,* 787 F.2d 736, 744 (1st Cir.1986), *cert. denied,* 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988)." *Zapata* at 978.

The Court continued: "courts often have held that evidence which would have turned up during an inventory search comes under the umbrella of the inevitable discovery rule." *Id.* (citations omitted). Such is the situation in the present case. The Supreme Court has recognized the validity of an inventory search, and listed various legitimate reasons for such procedure, which include: the protection of the owner's property while in police custody, protection of the police against claims or disputes over lost or stolen property, and protection of the police from potential danger. *Id. See South Dakota v. Opperman,* 428 U.S. 364, 369, 96 S.Ct. 3092, 3097, 49 L.Ed.2d 1000 (1976).

A particularly pertinent case is *Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). In *Bertine,* a police officer arrested appellant for drunk driving. After taking Bertine into custody and prior to the arrival of a tow truck to take Bertine's van to an impoundment lot, a backup officer inventoried the contents of the van. The backup officer inventoried the van in accordance with local police procedures, which required a detailed inspection and inventory of impounded vehicles. He found the backpack directly behind the front seat of the van. The officer opened the closed backpack in which he found controlled substances, which included cocaine and a large amount of cash.

Bertine was charged, *inter alia,* with possession of cocaine with intent to distribute. He moved to suppress the evidence found during the inventory search on the ground, inter alia, that the search of the closed backpack exceeded the permissible scope of such a search under the Fourth Amendment.

The district court granted the motion to suppress holding that the inventory search violated the Colorado Constitution. Upon appeal to the Colorado Supreme Court, it upheld the suppression based on the Fourth Amendment of the United States Constitution. The Supreme Court of the United States reversed, holding that the police officer's search did not violate the Fourth Amendment prohibition against unreasonable searches and seizures. The Court explained:

> [I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment. (citations omitted) The policies behind the warrant requirement are not implicated in an inventory search, nor is the related concept of probable cause:
>
> The standard of probable cause is peculiarly related to criminal investigations, not routine, noncriminal procedures ... the probable-cause approach is unhelpful when analysis centers upon the reasonableness of routine administrative caretaking functions, particularly when no claim is made that the protective procedures are a subterfuge for criminal investigations.

*Id.* at 371, 107 S.Ct. at 741.

Thus, an inventory search may be "reasonable" under the Fourth Amendment even though it was not conducted pursuant to a warrant based upon probable cause. *Id.* The Court held in *Bertine* that "there was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation. In addition, the governmental interests justifying the inventory searches in *Opperman* and *Lafayette* are nearly the same as those which obtain here. In each case, the police were potentially responsible for the property taken into their custody. By securing the property, the police protected the property from unauthorized interference. Knowledge of the precise nature of the property helped guard against claims of theft, vandalism, or negligence. Such knowledge also helped to avert any danger to police or others that may have been posed by the property." *Id.* at 372–73, 107 S.Ct. at 741–42.

In the case before us, it is clear that the agent Andaluz questioned Fernandez and searched the red Mitsubishi Mirage pursuant to an inventory search. The agent testified that "when I decided to make the arrest, you know, whenever we are going to transport a vehicle, it is our custom to ask the person if they have anything of value, or drugs or weapons inside of the vehicle. We do this as a routine normally because if there is a substantial amount of money we give it to the person to have custody of that money so that later on no allegations can be made that we have stolen the money."

Once agent Andaluz located the box and verified the contents of the box, he placed the box next to his legs, so Fernandez Santana would be aware of the box until it was seized from him. Once in the DEA office, the agents placed the money and the rest of the defendants' belongings in a table so they could always see them.

The record clearly shows that agent Andaluz's search was not conducted in bad faith or for the purpose of unearthing incriminating information from defendants. At the time that agent Andaluz conducted the search, he had already placed defendants under arrest. Thus, the money seized did not play a role in the determination of probable cause to justify the arrest. Furthermore, as noted above, the agent conducted the search pursuant to the established inventory search procedures of the DEA. The agent properly articulated the policies behind this procedure, which have been acknowledged by the Supreme Court in *Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987), *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) and *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983).

· Ironically, Agent Andaluz's questioning of Luis Fernandez Santana may not have been necessary to conduct the inventory search. Thus, by asking him regarding the existence of drugs, weapons or money in the car without providing the required *Miranda* warnings, the officer compelled Luis Fernandez Santana to needlessly incriminate himself. In the future, we advise law enforcement officers to provide the *Miranda* warnings immediately following the arrest of the sus-

pects. Such conduct will help prevent allegations of coercive interrogations and misunderstandings whether statements uttered by the defendants were voluntary or not.

### Registration of Luis Fernandez Santana's Wallet was Proper

Defendant Luis Fernandez Santana also claims that the evidence seized from his wallet was improperly obtained, and thus should be suppressed as a "fruit of the poisonous tree." The First Circuit faced a similar situation in *United States v. Sheehan*, 583 F.2d 30 (1st Cir.1978). In *Sheehan*, the police detained a suspect in a bank robbery investigation. After learning he had an outstanding warrant for a motor vehicle violation, the officer arrested the suspect. At the station the policeman searched appellant's wallet and reproduced with a photocopy machine several papers, including a piece of paper with several names and telephone numbers, then returned the originals to the wallet. The policeman sent the copies to an FBI agent, who checked on the information and determined that the paper constituted evidence that linked the appellant to a bank robbery.

After his conviction, appellant argued that seizure of the list of names and phone numbers from his wallet was illegal, since it was "mere evidence of an unrelated crime." The Court of Appeals rejected this argument, noting that the police had sufficient cause to believe that the evidence sought would aid in a particular apprehension or conviction. The Court relied on *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), noting that "the Supreme Court has made it increasingly clear that a lawful arrest justifies a special latitude of both search and seizure of things found on the arrestee's person." *Id.* at 32.

The First Circuit continued: "[t]he breadth of the power of warrantless seizure in cases of search incident to lawful arrest is suggested by the concluding passage in *Edwards*, 415 U.S. at 808–09, 94 S.Ct. at 1239:

> In upholding this search and seizure, we do not conclude that the Warrant Clause of the Fourth Amendment is never applicable to postarrest seizures of the effects of an arrestee. (footnote omitted) But we do think that the Court of Appeals for the

First Circuit captured the essence of situations like this when it said in *United States v. DeLeo*, 422 F.2d 487, 493 (1970)(footnote omitted):

> 'While the legal arrest of a person should not destroy the privacy of his premises, it does for at least a reasonable time and to a reasonable extent take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence.' "

*Id.*

█ In the present case, the agent searched Fernandez Santana's wallet while the defendant was still in the custody of the law enforcement officers pursuant to a legal arrest. The agent had read Fernandez Santana his *Miranda* rights, and was in process of conducting a final inventory search of defendant's belongings, to avoid any claims of stolen money or property. Once he found the note, he was entitled to inform his fellow agents about the evidence and determine whether Fernandez Santana should continue to be held in custody. Although defendant may claim that such search occurred just prior to his release, defendant cannot claim that he was not under custody. Were this a case where defendant had been released from the custody of the law enforcement officers, and an agent had then arrested him anew and rifled through his wallet without probable cause or a search warrant, the Court would most likely suppress any evidence obtained from the wallet. This case, however, presents an entirely different scenario. The defendant was still in custody, and consequently, his privacy interest in the contents of his wallet was significantly diminished. There was no need for additional probable cause or a search warrant to conduct the search of his wallet.

In view of the above mentioned case law, the Court finds that the agent acted properly when it searched Fernandez Santana's wallet and discovered the note which established a purported link between him, Juanito Fiel and the Eagle Caribe. Upon review of the totality of the circumstances, defendant's petition

to suppress the note taken from Fernandez Santana's wallet is **DENIED.**

**SO ORDERED.**