USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-1170

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 CARLOS RUBEN ACOSTA-COLON,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF PUERTO RICO

 [Hon. Hector M. Laffitte, U.S. District Judge]

 Before

 Stahl, Circuit Judge,
 
 Cyr, Senior Circuit Judge,
 
 and Lynch, Circuit Judge.
 
 

 Rachel Brill for appellant.
 Jos A. Quiles-Espinosa, Senior Litigation Counsel, with whom
Guillermo Gil, United States Attorney, Nelson Perz-Sosa, Assistant
U.S. Attorney, Warren V zquez, Assistant U.S. Attorney, and Camille
Vlez-Riv, Assistant U.S. Attorney, were on brief, for appellee.

October 5, 1998

 STAHL, Circuit Judge. A dog-sniff at the San Juan
international airport alerted authorities to the possible presence
of narcotics in four suitcases checked on a domestic flight to New
York City. Based on information that indirectly linked defendant
Carlos Ruben Acosta-Colon ("Acosta") to these bags, three law
enforcement officials stopped Acosta and two persons traveling with
him as they attempted to board the flight. At issue in this appeal
is the constitutionality of the ensuing thirty-minute detention
that led to Acosta's formal arrest. Conceding that Acosta was
stopped on the basis of suspicion short of probable cause, the
government contends that the detention was nevertheless reasonable
under the circumstances and fell within the parameters of Terry v.
Ohio, 392 U.S. 1 (1968). The district court agreed and denied the
defendant's motion to suppress. We now reverse.
 I.
 The following facts are not materially disputed. At
about 11 a.m. on November 3, 1995, a canine narcotics unit working
at the Luis Mu¤oz Marin Airport in Puerto Rico alerted an agent of
the United States Customs Department to the odor of drugs in four
American Tourister suitcases that had been checked on an American
Airlines flight scheduled to depart for New York City at 1 p.m. 
Two of the four bags had identification tags bearing the name of
Miguel Morales; the other two had tags showing the name Jes£s
Lebr¢n. Customs officers immediately seized all four pieces of
luggage and transported them to what the government describes as
the airport's "customs enclosure area."
 A supervisor in the customs office then requested from
American Airlines its computer record of any reservations on the
New York City flight in the name of, or connected with, Morales or
Lebr¢n. The airline provided a single computer printout reflecting
that Morales and Lebr¢n both had reserved seats on the flight and
had checked two bags each. The printout also showed two other
persons Carlos Acosta and Noel Travieso as being connected with
the Morales/Lebr¢n reservation, which suggested that all four
individuals might be traveling together. The computer record did
not indicate that Acosta himself had checked any bags.
 At about 12:30 p.m., three customs inspectors dressed in
plain clothes were dispatched to the gate from which the New York
City flight was to depart. The inspectors stationed themselves in
the jetway leading from the gate to the airplane and checked the
name on each passenger's ticket as he or she attempted to board. 
When Acosta, Noel Travieso, and a third suspect unnamed in the
record (but evidently known to local authorities) were identified
by this method, the inspectors took their boarding passes and
instructed them to step to one side of the jetway and wait there
until the boarding process was concluded. Acosta complied and was
thus detained on the jetway for approximately five minutes. He was
not asked any questions during this time.
 After all passengers had boarded the plane (neither
Morales nor Lebr¢n having appeared at the gate), the customs
inspectors informed Acosta, Travieso, and the third suspect that
they were to be taken to a "customs enclosure area" pending
investigation of some suspicious baggage. They were not asked to
give their consent, and they said nothing in response. Then,
without conducting a pat-down or asking any questions, and while
they were still on the jetway, the inspectors handcuffed the three
suspects to each other, side-by-side, using two sets of restraints. 
Although the inspectors were armed, they did not display their
weapons. The suspects did not resist. The customs inspectors led
the three handcuffed suspects, on foot, to the customs enclosure
area. The trip, which the government concedes was not voluntary,
took approximately six to eight minutes. Acosta and the others
missed their flight.
 Once the suspects were brought into the customs enclosure
area, they were patted down for weapons and, none being found,
their handcuffs were removed. According to the parties'
stipulation of facts, the three suspects were, at this point,
"transferred to the custody of the DEA" and were placed in separate
rooms that have been variously described in the briefs and at oral
argument as "interview," "interrogation," or "detention" rooms. 
After Acosta had been left in his interrogation room for
approximately 15 minutes during which time he was never
interviewed or questioned a customs inspector observed him trying
to eat two pieces of paper. The inspector entered Acosta's room
and extricated the papers from his mouth. They were baggage claim
tickets. The numbers on the tickets matched the tags on the two
previously-seized suitcases registered to Jesus Lebr¢n (which, upon
later examination, turned out to contain approximately 15 kilograms
of cocaine each). Acosta was advised of his Miranda rights and was
formally placed under arrest. Waiving his right to remain silent,
he made several potentially self-incriminating statements.
 Acosta was indicted on one count of possessing cocaine
with intent to distribute. Following a plea conference, Acosta
filed a motion to suppress, arguing that his airport detention
constituted a de facto arrest without probable cause, and that the
incriminating baggage claim tickets he had tried to eat and the
statements he made to authorities thereafter constituted the fruits
of that illegal arrest. After two hearings, and following the
parties' submission of their stipulated statement of facts, the
district court denied the defendant's motion. Acosta subsequently
pled guilty pursuant to the terms of a conditional plea agreement,
in which he reserved his right to appeal the district court's
ruling on the motion to suppress. The court accepted his plea, and
Acosta was accordingly sentenced to 70 months of imprisonment and
five years of supervised release.
 II.
 A.
 As a preliminary matter, we think it important to clarify
that, despite the involvement of the Customs Department and its
agents both in the initial detection of the drug-laden bags and the
stop of the defendant, nothing in the record or the briefs
indicates that the bags or any of the suspects were required to
pass through U.S. Customs, or were involved in any international
border-crossing. Thus, the special standards governing the
constitutionality of border searches have no application here. 
See, e.g., United States v. Montoya de Hernandez, 473 U.S. 531, 538
(1985) (explaining that the rules governing the constitutionality
of searches and seizures are "qualitatively different at the
international border than in the interior").
 The question presented in this appeal is narrowly drawn. 
There is no dispute that the defendant was "seized" for Fourth
Amendment purposes when he was prevented from boarding his
scheduled flight. See, e.g., United States v. Streifel, 781 F.2d
953, 960 (1st Cir. 1986) (explaining that a "seizure" occurs when
a reasonable person in the suspect's position would have believed
he was not free to leave). Furthermore, the government does notcontend that the stop of Acosta on the jetway was supported by
probable cause. It seeks, instead, to justify the detention as a
reasonable investigatory stop falling within the limits of Terry v.
Ohio, 392 U.S. 1 (1968). The defendant, for his part, does notattempt to argue that the government lacked the requisite level of
suspicion to warrant a Terry-type stop at the jetway. He asserts,
rather, that both the mode and duration of his detention were
unreasonable in the circumstances, exceeded the parameters of
Terry, and constituted a de facto arrest unsupported by probable
cause. The district court sided with the government, ruling that
Acosta's detention was a lawful Terry stop.
 B.
 In assessing the district court's determination, we
review its findings of fact for clear error, but we review de novoits conclusions of law and its ultimate rulings on the
constitutionality of the government's conduct. See United Statesv. Young, 105 F.3d 1, 5 (1st Cir. 1997). We bear in mind, too,
that where a defendant challenges the constitutionality of a
warrantless seizure undertaken on the basis of suspicion falling
short of probable cause, the government bears the burden of proving
that the seizure was sufficiently limited in its nature and
duration to satisfy the conditions of a Terry-type investigative
stop. See Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality
opinion); United States v. Johnson, 63 F.3d 242, 245 (3d Cir.
1995), cert. denied, 518 U.S. 1007 (1996); United States v. Perdue,
8 F.3d 1455, 1462 (10th Cir. 1993).
 C.
 Before the Supreme Court's decision in Terry, all
"seizures" of persons were analyzed as "arrests," which could be
constitutionally justified only when the government had probable
cause to believe that the seized person had committed or was
committing a crime. See Dunaway v. New York, 442 U.S. 200, 208-09
(1979); United States v. Quinn, 815 F.2d 153, 156 (1st Cir. 1987);
Wayne R. LaFave, Search and Seizure 5.1(a), at 9 (3d ed. 1996). 
In Terry, the Court gave effect to the notion that some types of
encounters between the police and citizens such as brief
detainments in the nature of a "stop and frisk" could constitute
"seizures" for Fourth Amendment purposes, yet be sufficiently
limited in their intrusiveness to fall outside the traditional
understanding of an "arrest." See Dunaway, 442 U.S. at 208-09. 
The Court held that these limited types of seizures, by virtue of
their low level of intrusiveness relative to the important law
enforcement purposes they served, could be constitutionally
justified on a level of suspicion falling short of probable cause. 
See id. at 209; Terry, 392 U.S. at 27; LaFave, supra, 5.1(a), at
9.
 Over time, the Terry doctrine has developed into an
extremely elastic rule with a broad range of application. In its
modern adaptation, the doctrine provides that "based merely on a
reasonable and articulable suspicion, a police officer may make a
brief stop or 'seizure' of an individual to investigate suspected
past or present criminal activity." United States v. McCarthy, 77
F.3d 522, 529 (1st Cir. 1996), cert. denied, 117 S. Ct. 771 (1997). 
Such a seizure will be upheld as constitutionally permissible so
long as it was "justified at its inception, and, if so, . . . the
action taken was reasonably related in scope to the circumstances
which justified the interference." Young, 105 F.3d at 6.
 This general test of reasonableness is obviously
expansive in its compass. As a doctrinal matter, however, the test
presupposes that the seizure under scrutiny was, on the whole, a
less intrusive measure than an actual arrest. In other words, a
warrantless seizure supported by less than probable cause
necessarily falls below the applicable threshold of reasonableness
if the seizure was the functional equivalent of an arrest. See,
e.g., Quinn, 815 F.2d at 156 (stating that detentions "which though
not technical, formal arrests are the 'equivalent of an arrest'
. . . require probable cause"). This must be so because Terry was
intended to carve out an exception to the probable cause
requirement only for relatively brief, non-arrest detentions;
plainly, a seizure that is, de facto, tantamount to an arrest
cannot fit within that exception. See id.; see also United Statesv. Zapata, 18 F.3d 971, 975 (1st Cir. 1994).
 There is no "litmus-paper test," however, to determine
whether any particular mode of detention amounted to a de factoarrest. Royer, 460 U.S. at 506 (plurality opinion); see alsoZapata, 18 F.3d at 975 (no "scientifically precise formula");
Quinn, 815 F.2d at 156 (no "mechanical checklist"). It is often
said that an investigatory stop constitutes a de facto arrest "when
'a reasonable man in the suspect's position would have understood
his situation,' in the circumstances then obtaining, to be
tantamount to being under arrest." Zapata, 18 F.3d at 975 (quoting
Berkemer v. McCarty, 468 U.S. 420, 441 (1984)); see also Young, 105
F.3d at 7; Quinn, 815 F.2d at 157; LaFave, supra, 5.1(a), at 9. 
But in a typical borderline case, e.g., one in which the detention
at issue has one or two arrest-like features but otherwise is
arguably consistent with a Terry stop, it will not be obvious just
how the detention at issue ought reasonably to have been perceived;
indeed, this will be the central point of contention. Thus, in
such a case that is, where the detention is distinguishable from,
yet has some features normally associated with, an arrest the
analysis must revert to an examination of whether the particular
arrest-like measures implemented can nevertheless be reconciled
with the limited nature of a Terry-type stop. This assessment
requires a fact-specific inquiry into whether the measures used
were reasonable in light of the circumstances that prompted the
stop or that developed during its course. See Young, 105 F.3d at
8 ("Above all else, our cases in this area evince the fact specific
nature of the inquiry."); Washington v. Lambert, 98 F.3d 1181, 1185
(9th Cir. 1996) (suggesting that the same police actions can
constitute a de facto arrest in some circumstances but not in
others).
 D.
 It can hardly be doubted that the initial stop and
subsequent detention of Acosta featured several characteristics
ordinarily associated with an arrest: he was prevented from
boarding his plane, placed in handcuffs, involuntarily transported
(in restraints) to an official holding area some distance from the
place of the original stop, confined to a small interrogation room
and kept there under observation for more than a momentary period;
yet he was never informed how long he would be detained nor told
that he was not under arrest. See United States v. Glenna, 878
F.2d 967, 972 (7th Cir. 1989) ("[H]andcuffs are restraints on
movement normally associated with arrest. Clearly, the thought of
allowing police officers to handcuff persons where probable cause
to arrest is lacking is a troubling one."); McCarthy, 77 F.3d at
532 (noting, in finding that detention was a permissible Terrystop, that the suspect "was never handcuffed" and was told he was
not under arrest); United States v. Berry, 670 F.2d 583, 598 (5th
Cir. 1982) (en banc) (suggesting that bringing a suspect to a
police office effects "a marked increase in the coercive nature" of
a detention). Furthermore, Acosta's detention caused him to miss
his flight to New York, and there is no suggestion that authorities
ever communicated to Acosta any concern over disrupting his travel
plans; certainly, they never gave him the choice of leaving. Cf.United States v. West, 731 F.2d 90, 91, 93-94 (1st Cir. 1984) (no
constitutional violation found where suspect was given choice of
waiting at airport and missing his flight while officers called in
a narcotics-detecting dog to sniff his suitcase, or departing on
his flight but leaving his suitcase behind); United States v.
Tavolacci, 895 F.2d 1423, 1428 (D.C. Cir. 1990) (detention more
likely to qualify as a Terry stop if it "did not interfere with
defendant's travel plans").
 These circumstances create, at the very least, a
substantial question as to whether a reasonable person in Acosta's
position would have understood his situation as tantamount to being
under arrest. But we need not rely solely on intuition to decide
whether the mode of Acosta's airport detention indeed exceeded the
limits of an investigatory Terry stop. Instead, we make our
determination against the background of the Supreme Court's
decision in Florida v. Royer, 460 U.S. 491 (1983). There, a
plurality of the Court concluded that an airport detention quite
similar to Acosta's but in some ways less intrusive exceeded
the outer limits of a Terry-type stop and constituted a de factoarrest. Because of the case's special relevance here, we discuss
it in some detail.
 In Royer, two narcotics detectives at Miami International
Airport observed an individual, Royer, who fit a so-called "drug
courier profile." Id. at 493. After Royer purchased a one-way
ticket to New York and checked two bags, the detectives stopped him
and asked whether he "had a 'moment' to speak with them"; Royer
responded "yes." Id. at 494. On request, Royer handed the
officers his airline ticket and driver's license. When the
officers pointed out to Royer that the name on his ticket did not
match the name on his driver's license, he became noticeably
nervous. See id. The detectives, after identifying themselves as
law enforcement officers and telling Royer that they suspected he
was transporting narcotics, asked him to accompany them to a
closet-sized room located in a "stewardesses' lounge" just adjacent
to the public concourse area, approximately 40 feet away from the
point of their initial encounter. Id. Royer said nothing but
followed the officers into the room, whereupon his bags were
retrieved and brought there. See id. With Royer's permission (or
at least his passive acquiescence), one of the officers opened both
of the two suitcases; a quantity of marijuana was found in each. 
See id. At that point about 15 minutes from the time of his
initial stop Royer was formally arrested. See id.
 In holding that Royer's Fourth Amendment rights were
violated, Justice White, writing for a plurality of the Court,
stated that "[i]n the name of investigating a person who is no more
than suspected of criminal activity, the police may not . . . seek
to verify their suspicions by means that approach the conditions of
an arrest." 460 U.S. at 499. Reviewing the salient features of
the investigatory seizure at issue, the plurality opinion
summarized the facts as follows:
 [The officers] requested [Royer] to accompany
 them to the police room. Royer went with
 them. He found himself in a small room a
 large closet equipped with a desk and two
 chairs. . . . What had begun as a consensual
 inquiry in a public place had escalated into
 an investigatory procedure in a police
 interrogation room, where the police,
 unsatisfied with previous explanations, sought
 to confirm their suspicions. The officers had
 Royer's ticket, they had his identification,
 and they had seized his luggage. Royer was
 never informed that he was free to board his
 plane if he so chose, and he reasonably
 believed that he was being detained.

Id. at 502-03. Based on these facts, the plurality concluded that,
"[a]s a practical matter, Royer was under arrest," id. at 503, and
that his detention therefore exceeded the limits of a Terry stop,
id. at 507.
 There is little to distinguish Acosta's case from Royer. 
The governmental objective here, as in Royer, was to investigate a
possible drug-trafficking offense more specifically, to confirm
or dispel a suspicion that Acosta had a connection with certain
luggage believed to contain narcotics (or with the persons to whom
the bags were registered). If anything, though, the mode of
Acosta's detention was more intrusive than Royer's: Acosta's stop
did not "beg[i]n as a consensual encounter," 460 U.S. at 503; he
was handcuffed, involuntarily taken to a secured area (the "customs
enclosure area") much farther than 40 feet from the place of his
initial stop; and he was confined to an official interrogation room
(rather than a "stewardesses' lounge"), from which the government
concedes he was not free to leave. Moreover, the total time of
Acosta's detention (up to the time of the formal arrest) was nearly
twice as long as Royer's.
 The government makes no suggestion that Royer is no
longer good law, nor does it deny the similarities between that
case and this one. Instead, the government asks us to focus upon
the Royer plurality's statement that "[t]here are undoubtedly
reasons of safety and security that would justify moving a suspect
from one location to another during an investigatory detention,
such as from an airport concourse to a more private area." 460
U.S. at 504. Parrotting this language, the government asserts in
its brief, with little elaboration, that "security reasons prompted
the officers not to interview [Acosta] at the jetway and to
transfer the site of the encounter . . . to the interrogation
room."
 The difficulty, however, is that the government has
utterly failed to identify specific facts supporting its invocation
of "security reasons" as justification for the movement of Acosta
to the interrogation room. It may well be true, of course, that
it was indeed safer for authorities to question Acosta in an
interrogation room than, for example, on the jetway. Common sense
suggests that transporting a suspect to an interrogation room (or
for that matter, locking him in a holding cell) will alwaysincrementally enhance the safety and security of law enforcement
officers and the public. In this sense, there will always exist
"security reasons" to move the subject of a Terry-type stop to a
confined area pending investigation. But if this kind of
incremental increase in security were sufficient to warrant the
involuntary movement of a suspect to an official holding area, then
such a measure would be justified in every Terry-type investigatory
stop. That result surely is not within the contemplation of Royer. 
See LaFave, supra, 9.2(g), at 75-76.
 Whatever might qualify as "reasons of safety and
security" sufficient to "justify moving a suspect from one location
to another during an investigatory detention" (such as from the
place of the initial stop to an interrogation room), Royer, 460
U.S. at 504 (plurality), the requisite justification cannot rest
upon bald assertions, such as those offered by the government here,
that law enforcement officers were in fact prompted to act on such
reasons. The government must point to some specific fact or
circumstance that could have permitted law enforcement officers
reasonably to believe that relocating the suspect to a detention
room was necessary to effectuate a safe investigation. See Royer,
460 U.S. at 505-06 (plurality). It has failed to do so.
 Our own independent examination of the record reveals
very little that would aid the government's position. In fact, a
reading of the suppression-hearing testimony of the customs
inspector who initially stopped Acosta only underscores the absenceof specific circumstances that might have supported a belief that
the suspects' relocation to the detention area was necessary for
reasons of safety or security. For example, when the customs
inspector was asked by the prosecutor to explain the instructions
he had received before attempting to intercept the suspects at the
gate area, he testified he was told by his supervisor "[t]o
identify [the suspects] if they boarded and and to bring them
back to the [customs] enclosure," whereupon, according to "standard
operating procedure," the suspects were to be "turned . . . over to
[the] DEA." Far from pointing to actual circumstances that might
have justified a belief that an investigatory stop could not have
been conducted safely without removing the suspects from the area
of the jetway, this testimony suggests that the decision to move
Acosta and the other suspects to the interrogation room was
essentially predetermined, undertaken simply as a matter of routine
for the purpose of facilitating a transfer of "custody" from the
customs agents to the DEA.
 In all events, it is evident that here, as in Royer, 
"[t]he record does not reflect any facts which would support a
finding that the legitimate law enforcement purposes which
justified the detention in the first instance were furthered by
removing" the defendant to an interrogation room in the so-called
customs enclosure area. 460 U.S. at 505.
 E.
 The fact that Acosta was placed in handcuffs before being
taken to the customs enclosure area further undercuts the
government's position that Acosta's seizure fell within the scope
of a Terry stop. We fully agree with the district court, and with
the government, that the use of handcuffs in the course of an
investigatory stop does not automatically convert the encounter
into a de facto arrest. See Perdue, 8 F.3d at 1463 (collecting
cases); Quinn, 815 F.2d at 157 n.2. Police officers engaged in an
otherwise lawful stop must be permitted to take measures 
including the use of handcuffs they believe reasonably necessary
to protect themselves from harm, or to safeguard the security of
others. See, e.g., Michigan v. Long, 463 U.S. 1032, 1047 (1983);
Washington, 98 F.3d at 1186; United States v. Stanley, 915 F.2d 54,
57 (1st Cir. 1990).
 But to say that the use of physical restraints is not
necessarily inconsistent with a Terry-type stop does not imply that
law enforcement authorities, acting on less than probable cause,
may handcuff suspects as a matter of routine. See Washington, 98
F.3d at 1187 ("Under ordinary circumstances, when the police have
only reasonable suspicion to make an investigatory stop, drawing
weapons and using handcuffs and other restraints will violate the
Fourth Amendment."); United States v. Smith, 3 F.3d 1088, 1094 (7th
Cir. 1993) (seizure involving use of handcuffs may be upheld as
Terry stop "in the 'rare' case wherein common sense and ordinary
human experience convince us that an officer believed reasonably
that an investigative stop could be effectuated safely only through
the use of handcuffs" (citation omitted)); see also LaFave, supra,
 9.2(d), at 39, 41-42.
 There is no question that the use of handcuffs, being one
of the most recognizable indicia of a traditional arrest,
"substantially aggravates the intrusiveness" of a putative Terrystop. Glenna, 878 F.2d at 972; see also United States v. McQuagge,
787 F. Supp. 637, 645 (E.D. Tex. 1991), aff'd, United States v.
Mallory, 8 F.3d 23 (5th Cir. 1993) (unpublished opinion). Thus,
when the government seeks to prove that an investigatory detention
involving the use of handcuffs did not exceed the limits of a Terrystop, it must be able to point to some specific fact or
circumstance that could have supported a reasonable belief that the
use of such restraints was necessary to carry out the legitimate
purposes of the stop without exposing law enforcement officers, the
public, or the suspect himself to an undue risk of harm. SeeWashington, 98 F.3d at 1189 (describing examples of such
circumstances); Glenna, 878 F.2d at 972-73; McQuagge, 787 F. Supp.
at 645-46; LaFave, supra, 9.2(d), at 40-42 (illustrating "special
circumstances" in which use of handcuffs might not exceed the
limits of a Terry stop).
 In this case, the government identifies no such specific
circumstances. There has been no suggestion that any one of the
suspects was being uncooperative, belligerent, or showed any
perceptible inclination to put up resistance or become violent. 
Nor is there evidence that any of the customs officers harbored an
actual suspicion that Acosta was armed or otherwise presented an
appreciable danger. The government nevertheless argues that the
handcuffing of Acosta was reasonable because "the officers[']
intervention was premised on reasonable suspicion of drug
interdiction," and Acosta, simply by virtue of being a suspected
drug trafficker, "could [have] be[en] armed," and this possibility
created a risk of harm to the "many innocent bystanders" present in
the general area (though presumably not in the jetway itself) where
Acosta was initially stopped.
 These highly generalized statements are inadequate to
establish that the handcuffing of Acosta was a reasonably measured
response to actual safety concerns arising from the stop. Like
the government's explanation for transporting Acosta to the
interrogation room, its factually unanchored justification for
placing Acosta in handcuffs is generalizable to virtually everyinvestigatory stop involving a drug suspect. To accept that
purported justification here would therefore be to endorse the use
of handcuffs in every investigatory stop initiated upon an
articulable suspicion of drug trafficking. This we are not
prepared to do. See United States v. Melendez-Garcia, 28 F.3d
1046, 1052-53 (10th Cir. 1994) (acknowledging reality that "[d]rugs
and guns and violence often go together" but holding that "the
naked fact that drugs are suspected will not support a per sejustification for use of . . . handcuffs in a Terry stop").
 We also find inadequate the government's suggestion that
the use of handcuffs may have been warranted by the need to ensure
the safety of law enforcement officials and the public as the
suspects were being transported to the customs detention area. 
First, as we have already noted, the government fails to specify
any factual basis for its supposition that Acosta or the other two
suspects might have presented an actual danger to the public or to
the customs officers (who were, after all, armed). But more
importantly, as discussed above, the government has failed to
demonstrate that Acosta's transportation to (and subsequent
detention in) the customs enclosure area was itself within the
limits of a Terry stop. Plainly, therefore, the need to facilitate
that very detention cannot provide a valid justification for the
use of handcuffs; such an argument would be naked bootstrapping, at
best. The government's Terry argument requires the identification
of specific circumstances that could have been thought to
necessitate the use of handcuffs to carry out safely the legitimatepurposes of the stop: here, investigating Acosta's connection with
the narcotics-laden suitcases. Cf. Royer, 460 U.S. at 505. No
such circumstances have been identified.
 F.
 Although we have been discussing, to this point, only
whether the mode of Acosta's detention was consistent with a Terry-type investigatory stop, we add a few words about the detention's
overall duration. There is, of course, "no rigid time limitation
on Terry stops," United States v. Sharpe, 470 U.S. 675, 685 (1985),
and we have previously upheld the constitutionality of
investigatory stops based on reasonable suspicion lasting for as
long as 75 minutes, see McCarthy, 77 F.3d at 531. Still, an
investigatory detention of close to 30 minutes particularly one
that interferes with an individual's "liberty interest in
proceeding with his itinerary," Place, 462 U.S. at 708 is hardly
a trivially intrusive affair. The question is whether the length
of Acosta's detention was reasonable, considering "'the law
enforcement purposes to be served by the stop . . . and whether the
police diligently pursued a means of investigation that was likely
to confirm or dispel their suspicions quickly, during which time it
was necessary to detain the defendant.'" McCarthy, 77 F.3d at 530
(quoting Sharpe, 470 U.S. at 686).
 The government's stated purpose for stopping Acosta was
to investigate whether he had any connection with or knowledge of
the narcotics-laden suitcases that had been checked on the New
York-bound flight that Acosta was about to board. Yet,
conspicuously absent from the government's presentation is anydescription of a single investigatory action that was being pursued
by law enforcement authorities, while Acosta was being detained, to
"confirm or dispel" their suspicion that Acosta was involved with
the suitcases. In fact, the government fails to provide us with
any insight at all into what the customs office, the DEA, or any
other law enforcement body was doing during the time that Acosta
was being detained on the jetway, transported to the customs area,
and left to wait in an interrogation room. We have thus been
provided with no basis in the record to conclude that the
responsible authorities were pursuing any active investigation, let
alone were "diligent" in doing so, to "confirm or dispel" their
suspicions concerning Acosta. There has been no suggestion,
furthermore, that Acosta was uncooperative or otherwise was himself
partly to blame for the extended length of his detention. Thus,
unlike in McCarthy, where the record supported a finding that the
suspect's detention became prolonged in spite of the diligent
efforts of police officers, see 77 F.3d at 531-32, the record
before us is devoid of any factual basis on which we could make a
similar finding.
 G.
 We emphasize, as we have already said, that there are no
bright-line rules to determine whether an investigatory stop
initiated on the basis of reasonable suspicion falls within the
ambit of Terry. Thus, even though several aspects of Acosta's stop
and detention (particularly when viewed in combination) appear to
mirror characteristics of a traditional arrest, these features do
not automatically convert the episode into a de facto arrest. The
presence of these arrest-like features does, however, require the
government to identify specific facts or circumstances which could
have led the acting law enforcement officers reasonably to believe
that the use of such measures was required to effectuate safely the
contemplated investigation. The government has not done so. 
Similarly, while there are surely a variety of circumstances that
could permit a finding of constitutional reasonableness with
respect to an investigatory stop of a duration comparable to or
exceeding that of Acosta, the government is required at least to
identify specifically what those circumstances might be. Again, it
has not done so. The government has thus failed to meet its burden
of demonstrating that Acosta's seizure was sufficiently limited in
its intrusiveness to have been constitutionally permissible in the
absence of probable cause. In so finding, we do not decide whether
the government's failure to provide adequate justification for any
single aspect of Acosta's seizure, considered in isolation, would
have yielded a similar conclusion. But given the absence of basis
in the record to support a finding of constitutional reasonableness
as to any one of the challenged aspects of the defendant's
warrantless seizure, we have little choice but to hold that the
stop, handcuffing, and ensuing detention at issue amounted to an
unlawful de facto arrest.
 III.
 Our holding that the defendant's stop and detention
exceeded the limits of a lawful Terry stop does not completely
resolve this case. While the conclusions we have reached require
us to reverse the district court's ruling that Acosta's
constitutional rights were not violated, those conclusions do not
determine the scope of the suppression order (if any) to be
entered. Because the court below denied the defendant's motion
to suppress, it had no occasion to make any findings as to the
particular items of evidence that might constitute the "fruits" of
any violation of Acosta's rights. But the question whether the
evidence the defendant seeks to suppress constitutes the fruit of
the poisonous tree or has been sufficiently "'purged of the primary
taint'" caused by the illegal seizure "depends primarily upon
weighing the facts in the particular case, . . . and is thus a
matter especially suitable for resolution by the district court" in
the first instance. United States v. Finucan, 708 F.2d 838, 843
(1st Cir. 1983) (quoting Wong Sun v. United States, 371 U.S. 471,
488 (1959) (internal citation omitted)). We must, therefore,
remand this matter to the district court for specific findings 
identifying which items of evidence, if any, can properly be deemed
the fruits of Acosta's illegal seizure.
 We think it fair to note, however, that based on the
record currently before us, we can see no reason why the baggage
claim tickets Acosta tried to swallow ought not be found to
constitute the fruits of his illegal detention. Cf. United Statesv. King, 990 F.2d 1552, 1563-64 (10th Cir. 1993) (finding that
drugs defendant attempted to discard during illegal arrest were
illegal fruits); LaFave, supra, 2.6(b), at 584-85 ("[W]here a
person has disposed of property in response to a police effort to
make an illegal seizure . . . courts have not hesitated to hold
that property inadmissible." (footnotes omitted)). On the other
hand, the status of the statements Acosta made to authorities after
receiving his Miranda warnings appears to us to present a closer
question, one as to which we express no view at this time. SeeBrown v. Illinois, 422 U.S. 590 (1975) (setting forth the relevant
analysis); United States v. Ramos, 42 F.3d 1160, 1164 (8th Cir.
1994) (explaining the holding of Brown), cert. denied, 514 U.S.
1134 (1995); United States v. Butts, 704 F.2d 701, 704-05 (3d Cir.
1983) (same).
 IV.
 For the reasons stated, the district court's denial of
the defendant's motion to suppress is reversed, the judgment of
conviction is vacated, and this case is remanded for further
proceedings consistent with this opinion. The defendant shall be
permitted to withdraw his plea of guilty, pursuant to the terms of
his conditional plea agreement. Cf. United States v. Infante-Ruiz,
13 F.3d 498, 505 (1st Cir. 1994).
 So Ordered.

 -- Dissent follows -- CYR, Senior Circuit Judge (dissenting). Objective
reasonableness is the touchstone for the present inquiry into
whether the challenged Terry stop ÄÄ reasonable at its inception ÄÄ
remained "reasonably related in scope to the circumstances which
justified the interference in the first place." See Terry v. Ohio,
392 U.S. 1, 20 (1968). "The court must consider the circumstances
as a whole, and must balance the nature of the intrusion with the
governmental interests that are served." United States v. Cruz,
slip op. No. 97-2167 (August 17, 1998) (quoting United States v.
Hensley, 469 U.S. 221, 228 (1985)). It is a fact-intensive inquiry
which contemplates a case-by-case balancing of the intrusiveness of
the challenged police conduct, on the one hand, against the safety
of the general public and the law enforcement officers on the
other. See Michigan v. Long, 463 U.S. 1032, 1046 (1983) (citingTerry, 392 U.S. at 21). In my view the majority opinion overlooks
legitimate law enforcement and safety concerns which amply
demonstrate the objective reasonableness of the challenged stop. 
See Terry, 392 U.S. at 23 ("Certainly it would be unreasonable to
require that police officers take unnecessary risks in the
performance of their duties.").
 The threshold focus is narrow: did the law enforcement
officers act reasonably in relocating Acosta and his traveling
companions from the jetway to the secure custom enclosure area
("CEA")? If so, the further measures taken by the officers to
protect themselves and the traveling public during the relocation
ÄÄ e.g., handcuffing and preventing Acosta from boarding the
scheduled flight ÄÄ were entirely warranted.
 Like Acosta, the majority relies heavily upon Florida v.
Royer, 460 U.S. 491 (1983). Although Royer remains viable
precedent, it is not apposite. Most notably, Royer explicitly left
open the possibility that some Terry-type "transportation" might be
warranted in an airport setting. See id. at 504-05 ("[T]here are
undoubtedly reasons of safety and security that would justify
moving a suspect from one location to another during an
investigatory detention, such as from an airport concourse to a
more private area . . . [but] [t]here is no indication in this case
that such reasons prompted the officers to transfer the site of the
encounter from the concourse to the interrogation room.") (emphasis
added); V-1 Oil Co. v. Means, 94 F.3d 1420, 1427 (10th Cir. 1996)
(same); United States v. Glover, 957 F.2d 1004, 1012 (2d Cir. 1992)
("We do not read Royer as establishing a per se rule that moving
from an airport, bus, or train terminal to a police office during
a Terry-type encounter, for purposes of further investigation,
automatically converts an otherwise permissible stop into an
impermissible arrest upon arrival at the office.") United States v.
Gonzalez, 763 F.2d 1127, 1137 (10th Cir. 1985) ("Changing the place
of an investigatory detention is not per se a Fourth Amendment
violation.") (Holloway, C.J., dissenting); accord Eberle v. City of
Anaheim, 901 F.2d 814, 819 (9th Cir. 1990) (citing Royer in
upholding relocation from concourse of football stadium).
 Although, as the majority opinion points out, the Acosta
stop was more intrusive than that in Royer, intrusiveness is but
one aspect of the balancing calculus. By their very nature Terrystops contemplate progressively intrusive law enforcement measures
commensurate with the heightening levels of reasonable suspicion
generated by the ongoing investigation. For example, a law
enforcement officer may initiate a stop merely by asking a question
to which the suspect may volunteer a response which arouses further
suspicion, thereby affording grounds for increasing the
intrusiveness of the stop. Should the officer acquire information
which generates a reasonable suspicion that the detainee may be
armed, for example, a patdown frisk would be warranted. Similarly,
should the officer acquire information which gives rise to a
reasonable suspicion that the detainee has committed a crime, more
probing questions may be in order.
 The only basis for suspicion possessed by the law
enforcement agents when Royer was stopped was that he fit their
"drug courier profile." No illegal drugs had been detected. By
contrast, even before the custom inspectors stopped Acosta, a
canine sniff had positively confirmed the presence of illegal drugs
in luggage scheduled to depart on the American Airlines flight
which Acosta and his traveling companions were about to board. 
Moreover, before the custom inspectors ever left for the jetway, an
American Airlines computer check had disclosed that Acosta and
Travieso were the only persons scheduled to depart on the flight
being boarded who might be traveling with "Morales" and "Lebron,"
the names used by the persons who had checked the drug-laden
luggage. At the jetway the custom inspectors temporarily detained
Acosta and Travieso pending confirmation that "Morales" and
"Lebron" had not attempted to board the plane. At that point the
inspectors reasonably concluded that the use of the names "Morales"
and "Lebron" had been a ruse, and that it was likely that Acosta
and/or one or both of his traveling companions were responsible for
checking the luggage. Although the government conceded that
probable cause was lacking at this point, given the confirmed
canine sniff and the subsequent observations by the custom
inspectors the level of reasonable suspicion nevertheless exceeded
the official "hunch" predicated exclusively on the drug courier
profile in Royer. And that substantially greater level of
reasonable suspicion demonstrated a legitimate need for further
investigative measures aimed at pinpointing the true identities of
"Morales" and "Lebron."
 Inspector Herdmann testified that removing Acosta to the
CEA accorded with standard operating procedure ("SOP"), which the
majority opinion mischaracterizes as a rote practice dissociatedfrom any articulable law enforcement rationale. Quite the
contrary, once the custom inspectors learned they had stopped a
likely drug trafficker the reasonableness of the rationale for the
SOP in these circumstances not only became evident but the
objective reasonableness of the heightened law-enforcement
intrusion which was to follow likewise became immediately apparent.
 As the district court correctly observed, the custom
inspectors rightly understood to a practical certainty, given the
positive canine sniff on four suitcases, that a substantialquantity of drugs was being transported by one or more passengers
about to board the departing American Airlines flight. The more
egregious the drug trafficking, the greater the stakes and risks;
and the more likely that the suspected perpetrators might attempt
to avoid, resist and/or escape detention by resorting to force. 
Thus, the longer the suspected high-stakes drug traffickers
remained in an unsecured area during the airport "rush hour," the
more palpable the threat posed to the traveling public as well as
the law enforcement officers themselves. See United States v.
Mendenhall, 446 U.S. 544, 561-62 (1980) ("The public has a
compelling interest in detecting those who would traffic in deadly
drugs for personal profit. . . . Much of the drug traffic is
highly organized and conducted by sophisticated criminal syndicates
. . . [so that] the obstacles to detection of illegal conduct may
be unmatched in any other area of law enforcement.") (Powell, J.,
concurring) (emphasis added). Furthermore, since one of the
detainees weighed approximately 300 pounds, the physical threat he
and his two companions posed to the traveling public and the law
enforcement officers strongly supported the reasonableness of the
decision to relocate the three suspects to a secure, private area
of the airport pending further investigation.
 Second, the evidence that two persons (i.e., "Morales"
and "Lebron") had checked four suitcases containing illegal drugs
afforded a rational basis for the district court finding that
multiple persons were involved in the drug smuggling, some of whom
may have remained at large and in a position to assist the three
detainees. See United States v. Gilliard, 847 F.2d 21, 25 (1st
Cir. 1988) (noting that in the Terry context it is "common
knowledge that drug traffickers often carry deadly weapons");
United States v. Trullo, 809 F.2d 108, 113 (1st Cir. 1987) ("'[W]e
have recognized that to substantial dealers in narcotics, firearms
are as much "tools of the trade" as are most commonly recognized
articles of drug paraphernalia.'") (citation omitted). Thus, in my
view the district court supportably found that the custom
inspectors were not required to complete their Terry-stop
investigation in the unsecured jetway, exposed to the various
articulable safety risks ÄÄ to themselves and the traveling public
ÄÄ which could readily be avoided simply by relocating the suspects
to a secure area nearby. The majority opinion simply ignores the
serious safety risks and the reasonableness of the more prudent
alternative utilized by the law enforcement officers at the scene.
 Finally, I find no case law which precludes law
enforcement officers from resorting to an appropriate prophylactic
SOP in circumstances which pose particularly serious safety risks
either to the traveling public or the law enforcement officers
themselves. Instead, there is considerable authority to the
contrary. See, e.g., Pennsylvania v. Mimms, 434 U.S. 106, 109-10
(1977) (endorsing government position that although "[i]t was
apparently [police] practice to order all drivers out of their
vehicles as a matter of course whenever they had been stopped for
a traffic violation, . . . this practice was adopted as a
precautionary measure to afford a degree of protection to the
officer and that it may be justified on that ground."); see alsoMaryland v. Wilson, 117 S. Ct. 882, 884 (1997) (extending Mimms to
an SOP allowing police to order all occupants from a stopped car);
United States v. Kimball, 25 F.3d 1, 8 (1st Cir. 1994) (sustaining,
on safety grounds, a "[police] department policy not to engage in
detailed interviews on the side of the road").
 Nor does resort to such an SOP insulate law enforcement
conduct from appropriate judicial review. Rather, the reviewing
court must examine the reasonableness of the SOP in light of the
circumstances in which it was utilized. Tellingly, however, the
defense has never challenged either the efficacy of the SOP or the
implicit foundation for its employment; that is, that no publicarea of the airport afforded a safe environment for detaining and
interrogating the potentially dangerous suspects in these
circumstances. In these circumstances, given the high level of
reasonable suspicion supporting the initial Terry stop, the safety
threat posed to the traveling public and the law enforcement
officers themselves, and the escape risk presented by any criminal
associates remaining at large, it is unrealistic to second-guess
the reasonable actions taken by the law enforcement officers at the
scene. Accordingly, I respectfully dissent.